```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/12/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
GERARD NGUEDI,

                Plaintiff,

-against-

THE FEDERAL RESERVE BANK OF NEW YORK,

                Defendant.
-----------------------------------------------------------------X

1:16-cv-0636-GHW

OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

    In this lawsuit, *pro se* plaintiff Gerard Nguedi seeks an award of damages in excess of $200 million against his former employer, the Federal Reserve Bank of New York (the "New York Fed" or "Defendant"). He alleges that the New York Fed discriminated against him and created a hostile work environment on the basis of his race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). The Court also construes the operative complaint to raise claims for false arrest. Defendant has moved to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendant's motion to dismiss is GRANTED.

I.   BACKGROUND[1]

    Plaintiff began working as a consultant in a "contract to hire" position for the New York Fed's Technology Services Group ("TSG") on August 5, 2015, after having been hired through a

---

[1] Unless otherwise noted, the facts are taken from the fourth amended complaint or Plaintiff's opposition to Defendant's motion, and are accepted as true for the purposes of this motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

consulting company named Soft, Inc.[2] Fourth Am. Compl. (ECF No. 29) ("Compl.") ¶¶ 8, 14, 18. Upon commencing his employment with the New York Fed, Plaintiff's direct supervisor was Vice President Donna Crouch. Compl. ¶ 9. Plaintiff alleges that Crouch "engaged in a pattern of discrimination and harassment against [him] due to his race" from the time he was hired through his termination. Compl. ¶ 10. According to the Fourth Amended Complaint, Plaintiff performed well in his job. He "repeatedly received numerous compliments from his coworkers for his excellent work" and "successfully contributed to several critical projects." Compl. ¶¶ 13-14. In addition, Plaintiff consistently took a leadership role in discussing and addressing problems during TSG meetings and helped to "advance initiative[s] that where [sic] stagnating for years." Compl. ¶ 14.

On Plaintiff's first day of work at the New York Fed, the clerk who took his photograph and processed his employee ID badge "was very polite and extremely nice to all the white employees but didn't want to help the Plaintiff until she asked Plaintiff to sit on a chair and then a few moments later told the Plaintiff she was done." Pl.'s Opp'n to Def.'s Mot. to Dismiss (ECF No. 47) ("Pl.'s Opp'n") at 7. Plaintiff alleges that the photograph on his badge was taken while he was "looking away and looking very 'suspicious,'" but when he pointed that out to the clerk, she told him that "nothing was wrong with the picture and refused to take another picture." Pl.'s Opp'n at 7. When Plaintiff returned multiple times in subsequent weeks to complain about his ID photo, the same clerk allegedly "ignored [his] request and was getting irritated against the Plaintiff but at the same time being extremely polite and helpful with all the white employees who where [sic] there for similar service." Pl.'s Opp'n at 7.

In November 2015, Plaintiff alleges, Crouch became openly hostile toward him and "began monitoring all of [his] activities." Compl. ¶ 16. She frequently called Plaintiff into her office to

---

[2] In the Fourth Amended Complaint, Plaintiff alleges that he began his job on August 5, 2016. Compl. ¶ 8. However, based upon the remainder of Plaintiff's allegations, it is apparent that he intended to allege his start date as August 5, 2015.

2

chastise him for minor oversights or "things[ ] which were not his responsibility." Compl. ¶ 17. These meetings "would quickly degenerate into Crouch yelling and berating [Plaintiff] with no apparent reason, explanation or provocation." *Id.* On one occasion, Crouch called Nguedi into her office and "directed him to display less leadership at TSG meetings." Compl. ¶ 18. Nevertheless, although Crouch chastised and yelled at Plaintiff in public and private settings, "every time [Plaintiff] directly asked Crouch [for] feedback on [his] performance Crouch gave [him] very good feedback in private." Compl. ¶¶ 18, 20. At some point in time, Crouch began requiring that Plaintiff "pass all status report emails and other sometimes-insignificant work reports through her for review." Compl. ¶ 19. According to Plaintiff, other employees were not subject to yelling and berating from Crouch or to this type of monitoring.

In early December 2015, Crouch updated Plaintiff's Active Directory ("AD") account with a date for the end of his contract. Compl. ¶ 21. Plaintiff alleges on information and belief that Crouch made this change "to intimidate [him] and create anxiety that he would not gain a permanent position with the New York Fed as he hoped." Compl. ¶ 23. Shortly thereafter, Crouch was removed from her position as Plaintiff's supervisor. Compl. ¶ 24.

When Plaintiff reported to work at the New York Fed on December 23, 2015, he brought his personal luggage with him, because he planned to travel to Virginia that evening. Compl. ¶ 29. His luggage contained a Taser and a key-chain-sized pepper spray that he had purchased on eBay a few days earlier for himself and his sister in Virginia. Compl. ¶ 29. Plaintiff alleges that he "was not aware that the Taser was prohibited within the confines of New York State." *Id.* When Plaintiff arrived at work, he reported that there was a Taser and pepper spray in his luggage. Compl. ¶ 30. The New York Fed Police informed Plaintiff that those items were not permitted in New York State and that they would have to confiscate and destroy them. *Id.* Plaintiff turned them over with no objection and apologized for his error, after which he was asked to wait as his manager, Crouch, was

contacted. Compl. ¶ 31. Shortly thereafter, Plaintiff alleges, "former NYPD commissioner Bill Bratton came out of a room and he was extremely angry at the Plaintiff as if [he] had committed a very grave crime and asked [him] if he has a gun or a knife in his luggage. [Plaintiff] responded that he was not in possession of a gun or a knife and no such items were in his luggage." Compl. ¶ 32. Bratton's "tone and intensity where [sic] both geared toward making the Plaintiff feel intimidated and scared." Compl. ¶ 33. The police then arrived and, "following the commands of former Police Commissioner Bill Bratton," NYPD officers arrested Plaintiff and brought him to a nearby police precinct. Compl. ¶ 34. According to Plaintiff, Bratton is a "know [sic] racist man advocating for his 'Broken Windows' and 'Stop and Frisk' unconstitutional policies designed to hurt minorities and specicfically [sic] African Americans who are disproportionately affected by virtually every policy he has done during his entire career." Pl.'s Opp'n at 6. As a result, Plaintiff alleges, "the fact that [Crouch] executed this 'false arrest' with [Bratton] himself personally involved in such a minor issue speaks volume [sic]." *Id.*

Plaintiff alleges that his release from police custody was "delayed because an unknown individual at the New York Fed was apparently pressuring for [him] to be held in police custody." Compl. ¶ 35. One of the officers who had arrested Plaintiff told him that "somebody from the Federal Reserve is calling to make it a bigger deal than it is." Compl. ¶ 35. The other officer who had arrested him told him "to be careful because the man who ordered his arrest was Police Commissioner Bill Bratton and that plaintiff should continue to make sure he is very polite and carefully [sic] if he has to address him again." Compl. ¶ 37. Plaintiff was issued two Class C Summonses for possession of the Taser and pepper spray and was released the same day. Compl. ¶¶ 36-38.

After being released, Plaintiff returned to the New York Fed to report to work, but the New York Fed Police refused to let him into the building. Compl. ¶ 38. One officer who had assisted in

4

Plaintiff's arrest that morning suggested that he contact Crouch and ask for permission to enter. *Id.* Plaintiff alleges that he called Crouch on her cellphone, but she told him that it was up to the New York Fed Police whether to allow him into the building. Compl. ¶ 39. He also alleges that the New York Fed Police "were directed by an individual in management not to permit [him] to return to work." *Id.*

Plaintiff contacted Soft, Inc., which informed him that the New York Fed was currently "weighing whether or not [he] should be terminated for being arrested for having a Taser in his luggage that morning" and directed him to "proceed home and wait for further direction." Compl. ¶ 40. When Plaintiff arrived home, he logged into his work email and found an email that had been sent by Crouch immediately after his arrest that morning announcing that Plaintiff was no longer employed with the New York Fed. Compl. ¶¶ 40-41. Later that day, Soft Inc. officially notified him that he had been terminated because of the Taser. Compl. ¶ 41. According to the Fourth Amended Complaint, the summonses against Plaintiff were eventually dismissed by a court as "legally insufficient." Compl. ¶ 45.

Plaintiff is an African-American man from Cameroon. Compl. at p. 3 & ¶ 42, 47. He alleges that the New York Fed subjected him to "discrete adverse employment actions as well a hostile work environment based on race and national origin in violation of Title VII of the Civil Rights Act of 1964." In particular, Plaintiff alleges that the Taser in his luggage "was used as an excuse" and that, "[s]imply because of [his] race, and despite good performances the Defendant decided to use a minor mistake made by the plaintiff to get rid of the plaintiff in a brutal and devastatingly destructive way for [his] career and reputation." Compl. ¶¶ 42, 44. Plaintiff further alleges that, in his experience, "the New York Fed has a very hostile environment for African Americans who are not really allowed to have leadership and authority regardless of their title." Compl. ¶ 43.

Plaintiff initiated this action on January 27, 2016. ECF No. 2. After a series of

amendments, Plaintiff filed his Fourth Amended Complaint on October 24, 2016. ECF No. 39. Defendant moved to dismiss Plaintiff's Fourth Amended Complaint in its entirety on December 2, 2016. ECF Nos. 45-46. Plaintiff filed an opposition on December 30, 2016, ECF No. 47, and Defendant filed its reply on January 17, 2017, ECF No. 48.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions . . . are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-

79). A complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

Because he is proceeding *pro se*, the Court must liberally construe Plaintiff's allegations and "interpret[ ] [them] to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (emphasis in original); *see also, e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . ."). Nevertheless, dismissal of a *pro se* complaint is appropriate where a plaintiff has clearly failed to meet the minimum pleading requirements. *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

### III. DISCUSSION

#### A. Title VII Claims

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). Title VII prohibits employers from mistreating an individual because of the individual's protected characteristics. *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007). However, mistreatment at work that occurs for a reason other than an employee's protected characteristic or opposition to unlawful conduct is not actionable under Title VII. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

Construed liberally, the Fourth Amended Complaint asserts two distinct Title VII claims: (1) a claim for employment discrimination on the basis of race, color, and national origin and (2) a hostile work environment claim. The Court will address each claim in turn.

### 1. Race, Color, and National-Origin Discrimination

To state a claim for employment discrimination pursuant to Title VII absent direct evidence of discrimination, a plaintiff must allege facts sufficient to plausibly support the inference that he (1) is a member of a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) has "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). With respect to the fourth element, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id.*

Here, as Defendant concedes, Plaintiff has adequately alleged the first three elements. However, Plaintiff's Fourth Amended Complaint does not contain any factual allegations that could support even a minimal inference that the New York Fed terminated him or otherwise subjected him to adverse action or mistreatment *because of* his race, color, or national origin. Examples of circumstances that can give rise to an inference of discrimination include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id.* at 311 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). "An inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000)).

Although Plaintiff alleges that his supervisor, Crouch, monitored him, yelled at him, and berated him, Compl. ¶¶ 16-20, he does not plead any particular conduct or remarks—by either

8

Crouch or any other employee of the New York Fed—that could be viewed as reflecting discriminatory animus. Plaintiff does allege, on information and belief, that "other employees were not subjected to" monitoring, yelling, and berating by Crouch, Compl. ¶¶ 16-20, but he does not allege that those "other employees" were similarly situated employees who fell outside his protected groups. *See Littlejohn*, 795 F.3d at 312 ("[T]he district court correctly concluded that adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination."). The same is true with respect to Plaintiff's allegation that the employee who was responsible for providing him with his ID badge treated him rudely while being "very polite and extremely nice to all the white employees." Pl.'s Opp'n at 7. And even assuming *arguendo* that this employee treated him rudely because of his race, color, or national origin, the Fourth Amended Complaint is devoid of any allegations supporting any causal relationship between that unnamed employee's treatment of, or feelings toward, Plaintiff and any of the adverse employment action that he alleges to have suffered. As a result, while Plaintiff may plead facts sufficient to support an inference that Crouch and the ID clerk held a personal dislike for Plaintiff, he does not allege facts that give to rise to even a minimal plausible inference that Crouch (or anyone else) terminated him or otherwise subjected him to adverse treatment *because of* his race, color, or national origin.[3] *See, e.g., Brodt v. City of New York*, 4 F. Supp. 3d 562, 569 (S.D.N.Y. 2014) (granting motion to dismiss where "plaintiff's allegations of discriminatory motive reflected an uncomfortable workplace environment, as opposed to discriminatory animus"); *Wilson v. Family Dollar Stores Of New York, Inc.*, No. 06-cv-639 (DGT), 2008 WL 4426957, at * 8 (E.D.N.Y. Sept. 25, 2008) (finding that, although behavior "may be rude and unprofessional, it merely indicates personal enmity rather than discrimination and thus

---

[3] Plaintiff's conclusory allegations that he was arrested "[j]ust because [he] is black," that his termination was "rooted in racism and racial discrimination," and that he was subjected to "discrete adverse employment actions as well as a hostile work environment based on race and national origin," Compl. ¶¶ 42, 47, are, of course, insufficient to sustain his claim without the requisite minimal factual support.

9

does not violate Title VII.").

To state a claim under Title VII, a plaintiff may not simply allege that he is a member of a protected class and that he suffered adverse employment action. He must also plead facts sufficient to support a minimal inference of a causal connection between the adverse action and his membership in the protected class. While Plaintiff does the former, he does not do the latter. Accordingly, Plaintiff's Title VII discrimination claim is dismissed.

### 2. Hostile Work Environment

"To state a hostile work environment claim in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive— that is, . . . [the conduct] creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of [any characteristic protected by Title VII]." *Patane*, 508 F.3d at 113 (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)). As the Court has already explained, Plaintiff fails to allege that any of the treatment to which he was allegedly subjected was motivated by his race, color, or national origin, even under the lenient *Littlejohn* standard. And Plaintiff's allegation that the New York Fed subjected all of its African American employees to adverse employment action and a hostile work environment based upon their race is unsupported by a single example, even though he alleges this "based on [his] close experiences and observations."[4] Compl. ¶ 47. Because Plaintiff fails adequately to allege that a hostile work environment was created "because of" a protected characteristic, he has failed to "nudge" his claim "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570. Therefore, Plaintiff's

---

[4] Plaintiff's example of the ID clerk treating *him* rudely does not serve as an example of the treatment of *other* African-American or foreign employees, much less any widespread pattern that affects *all* such employees.

hostile work environment claim is dismissed.

### B. False Arrest Claims

Although Plaintiff does not expressly assert a claim for false arrest in his Fourth Amended Complaint, he does allege that he was arrested, and he includes in his demand for relief an amount of $1,150,000 for "[f]alse arrest." Compl. at p. 10. Accordingly, and in light of its duty to liberally construe *pro se* pleadings, the Court construes the Fourth Amended Complaint to raise claims of false arrest under both federal and state law.

To the extent that Plaintiff alleges a false arrest claim pursuant to § 1983, that claim fails at the gate. "To state a claim under § 1983, a plaintiff must allege two elements: (1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). "Acting under color of state law is defined as the '[m]isuse of power, *possessed by virtue of state law* and made possible only because the wrongdoer is clothed with the authority of state law." *Annunziato v. The Gan, Inc.*, 744 F.2d 244, 249-50 (2d Cir. 1984)) (emphasis added). Although the New York Fed is not a private actor, it also does not act on behalf of a state. Instead, it is a corporate instrumentality of the United States that derives its powers from, and is chartered pursuant to, the Federal Reserve Act. *Clay v. Myers*, No. 12-cv-1535 (BMC), 2012 WL 1458207, at *2 (E.D.N.Y. Apr. 27, 2012); *Scott v. Fed. Reserve Bank of N.Y.*, 704 F. Supp. 441, 446-47 (S.D.N.Y. 1989). Because the New York Fed does not act under color of state law, Plaintiff fails to state a claim for false arrest against the New York Fed under § 1983.

To the extent that Plaintiff alleges a false arrest claim pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), that claim fails as well. Such a claim is not cognizable against the United States or federal agencies. *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994); *see also*

11

*Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) ("The only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities." (citation omitted)).

In any event, the facts that Plaintiff alleges do not state a plausible false arrest claim under either federal or state law.[5] A federal constitutional claim for false arrest or false imprisonment is substantially the same as a claim for false arrest under New York law. *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). Such a claim requires a plaintiff to show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *See Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Broughton v. State of New York*, 335 N.E.2d 310, 314 (N.Y. 1975)). The existence of probable cause acts as a complete defense to a false arrest or false imprisonment claim. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (citation omitted). Here, Plaintiff alleges that the New York Fed Police and the NYPD witnessed him in possession of a Taser that was illegal in New York.[6] Compl. ¶ 29-30. Accordingly, Plaintiff's own allegations establish that both the New York Fed Police and the NYPD had probable cause to arrest him. As a result, his claims for false arrest under federal and state law are dismissed.[7]

Because Defendant does not act under color of state law, and Plaintiff himself concedes that he was in unlawful possession of a weapon at the time of his arrest, the Court concludes that amendment of these claims would be futile. Accordingly, they are dismissed with prejudice.

---

[5] Ordinarily, the Court would decline to exercise supplemental jurisdiction over state law claims where, as here, all federal claims have been dismissed and there is no diversity of citizenship between the parties. However, the Court retains original subject matter jurisdiction over Plaintiff's state law claims in this instance because, pursuant to federal statute, "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States." 12 U.S.C. § 632.

[6] In New York, possession of an "electronic stun gun" constitutes criminal possession of a weapon in the fourth degree and is punishable by up to one year of imprisonment. N.Y. Penal Law § 165.01; *id.* § 70.15(1).

[7] The existence of probable cause for his arrest also vitiates Plaintiff's argument that his arrest was a mere pretext for a racially discriminatory termination.

### C. New York State Human Rights Law Claim

Discrimination claims pursuant to the NYSHRL are subject to the same standard as Title VII claims. *Patane*, 508 F.3d at 113; *Salazar v. Ferrara Bros. Bldg. Materials Corp.*, No. 13-cv-3038 (JG), 2015 WL 1535698, at *5 (E.D.N.Y. Apr. 6, 2015). Therefore, Plaintiff's NYSHRL claim is dismissed for the reasons described in Section III.A, *supra*.

### D. New York City Human Rights Law Claim

Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009). The Restoration Act established two new rules of construction for the NYCHRL: (1) "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a *floor* below which the City's Human Rights law cannot fall'"; and (2) a requirement that the NYCHRL provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act §§ 1, 7). The Second Circuit has clarified that these amendments to the Restoration Act require courts to analyze NYCHRL claims "separately and independently from any federal and state law claims." *See id.* The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio v. City of New York,* 16 N.Y.3d 472, 477–78 (2011)).

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . race . . . color[, or] national origin .

. . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). In contrast to Title VII, NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155 (LGS), 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik*, 615 F.3d at 113). Instead, the proper inquiry under the NYCHRL is whether the plaintiff "was treated 'less well' because of her [membership in a protected class]." *Pena-Barrero v. City of New York*, No. 14-cv-9550 (VEC), 2017 WL 1194477, at *15 (S.D.N.Y. Mar. 30, 2017) (quoting *Mihalik*, 715 F.3d at 111).

Although the Restoration Act requires that courts construe the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible," courts "must be mindful that the NYCHRL is not a 'general civility code.'" *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S. 2d 27, 40-41 (App. Div. 2009)). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. [He] must show that [he] has been treated less well at least in part 'because of [his protected characteristic].'" *Id.* (citing *Williams*, 872 N.Y.S. 2d at 39, 40 n.27).

Even under the NYCHRL's broad and liberal standard, Plaintiff's discrimination claims fail because, for the reasons described earlier in this opinion, he has not plausibly alleged that any differential treatment he suffered was "caused by a discriminatory motive," even in part. *See Mihalik*, 715 F.3d at 110. Accordingly, Plaintiff's NYCHRL claim is dismissed.

IV.  **LEAVE TO AMEND**

In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P.

14

15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Moreover, "leave to replead should be liberally granted to *pro se* litigants." *Vallen v. Plan*, No. 15-CV-0703 (JS), 2016 WL 482026, at *4 (E.D.N.Y. Feb. 4, 2016) (citing *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). Although Plaintiff has already amended his complaint four times, he has not yet had an opportunity to do so in response to an opinion of the Court. Accordingly, the Court cannot conclude that allowing Plaintiff to amend once more would be futile, except with respect to the false arrest claims, which have been dismissed with prejudice.

The Court grants Plaintiff leave to amend his complaint, solely with respect to those claims that were not dismissed with prejudice, to correct the deficiencies identified in this opinion. Any amended complaint must be filed no later than 30 days after the date of this order. If Plaintiff fails to file a fifth amended complaint within that time, this action will be dismissed and judgment will enter.

## V. CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED in its entirety. Plaintiff's claims under Title VII, the NYSHRL, and the NYCHRL are dismissed without prejudice. Plaintiff's claims for false arrest under are dismissed with prejudice.

The Clerk of Court is directed to terminate the motion pending at ECF No. 45.

The Court will mail a copy of this opinion and order to Plaintiff, along with all unreported decisions cited herein.

SO ORDERED.

Dated: June 11, 2017
New York, New York

GREGORY H. WOODS
United States District Judge