UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

GERARD NGUEDI,                          :
                                        :
                          Plaintiff,    :
            -against-                   :          1:16-cv-0636-GHW
                                        :
THE FEDERAL RESERVE BANK OF NEW         :          MEMORANDUM OPINION
YORK,                                   :              AND ORDER
                                        :
                          Defendant.    :
-------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

*Pro se* plaintiff Gerard Nguedi was terminated from his employment with the Federal Reserve

Bank of New York (the "New York Fed" or "Defendant") after he attempted to enter the bank with

a Taser. After his termination, Plaintiff filed this lawsuit, seeking an award of damages in excess of

$200 million against the New York Fed. Plaintiff filed his fifth amended complaint after the Court

granted Defendant's motion to dismiss the fourth amended complaint. Plaintiff alleges that the

New York Fed discriminated against him and created a hostile work environment on the basis of his

race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law

("NYCHRL"). In his fifth amended complaint, Plaintiff for the first time also lists two new

defendants: former NYPD Commissioner Bill Bratton, and the New York Police Department

(NYPD). The New York Fed has moved to dismiss Plaintiff's claims pursuant to Federal Rule of

Civil Procedure 12(b)(6).

Defendant's motion to dismiss is GRANTED with respect to the Title VII hostile work

environment claim. However, because Plaintiff's allegations raise an inference of discrimination and

plausibly suggest that Plaintiff was treated less well than other employees outside of his protected

classes, Defendant's motion is DENIED with respect to Plaintiff's Title VII discrimination claim,

NYSHRL claim, and NYCHRL claim.

## I. BACKGROUND[1]

### A. Plaintiff's Employment at the New York Fed

Plaintiff is an African-American man from Cameroon. Fifth Amended Complaint (ECF No. 51) ("Compl.") ¶ 19; Pl.'s Opp. to Def.'s Mot. to Dismiss (ECF No. 60) ("Pl.'s Opp.") at 6. He began working as a consultant in a "contract to hire" position for the New York Fed's Technology Services Group ("TSG") on August 5, 2015, after having been hired through a consulting company named Soft, Inc.[2] [3] Compl. ¶¶ 9, 21, 48. Plaintiff's direct supervisor was Vice President Donna Crouch. Compl. ¶¶ 14, 19. Plaintiff was the only African American under Crouch's supervision. Compl. ¶ 19. Plaintiff alleges that Crouch "engaged in a pattern of discrimination and harassment against [him] due to his race" from the time he was hired through his termination. *Id.*

On Plaintiff's first day of work at the New York Fed, the clerk who took his photograph and processed his employee ID badge did "not greet[] or acknowledge[] Plaintiff on his arrival, but she "greeted, acknowledged and served white patrons who entered the office." Compl. ¶ 11. Plaintiff

---

[1] Unless otherwise noted, the facts are taken from the Fifth Amended Complaint or Plaintiff's Opposition to Defendant's Motion to Dismiss, and are accepted as true for the purposes of this motion. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] In the Fifth Amended Complaint, Plaintiff alleges that he began his job on August 5, 2016. Compl. ¶ 9. However, based upon the remainder of Plaintiff's allegations, it is apparent that he intended to allege his start date as August 5, 2015.

[3] The fifth amended complaint is unclear as to the specific arrangement between Defendant and Soft, Inc. Title VII distinguishes between an "employer" and an "employment agency." *Compare* 42 U.S.C. § 2000e(b) (1982) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . . ."), *with* 42 U.S.C. § 2000e(c) ("The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person."). Here, Plaintiff's fifth amended complaint suggests that Soft, Inc. is an employment agency that procures employees for the New York Fed. The New York Fed does not contest that it was Plaintiff's employer. Moreover, joint employment under Title VII is "sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, and it has been applied to temporary employment or staffing agencies and their clients." *Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 466 (S.D.N.Y. 2017) (internal quotation marks and citations omitted). Therefore, for purposes of this motion, the Court accepts that the New York Fed was Plaintiff's "employer."

complained to the clerk about the treatment but was ignored. *Id.* Only "[a]fter all the other white patrons had been served" did the clerk serve Plaintiff. *Id.* The clerk took the photograph for Plaintiff's ID badge "without warning," while he was looking away, and the photograph made him "look suspicious." Compl. ¶¶ 12-13. When Plaintiff pointed that out, the clerk refused to issue him a new badge. Compl. ¶ 13. The clerk refused on several later occasions to take a new ID photo of Plaintiff, and would sometimes "ignore Plaintiff while instead serving the white patrons in the office." Compl. ¶ 15. On one occasion, the clerk interrupted Plaintiff's request for a new photo by saying "we don't serve black people," adding "maybe we need a sign." Compl. ¶ 16. When Plaintiff complained about his ID photograph to Crouch, she acknowledged that it was "bad and unprofessional." Compl. ¶ 14. Nonetheless, Crouch did not assist him in getting a new ID badge, and instead passed his "picture around the room and laughed at" him. *Id.* Plaintiff alleges that Crouch would usually resolve such a situation for Caucasian employees by making a phone call. Pl.'s Opp. at 5.

On one morning during Plaintiff's first month of employment, a Caucasian cashier working in the bank's cafeteria saw Plaintiff while he was waiting to be served next to the cash register. Compl. ¶ 17. The cashier did not attend to him, and he returned the breakfast food he had intended to buy. *Id.* The cafeteria manager, an African American woman, later told Plaintiff she believed he was not served "because of his race." *Id.* The manager also warned Plaintiff "about the prevailing culture of racial discrimination in the workplace." *Id.*

Despite these incidents, Plaintiff performed well in his job. Compl. ¶¶ 21-22. He "repeatedly received numerous compliments from his coworkers for his excellent work" and "successfully contributed to several critical projects." *Id.* In addition, Plaintiff consistently took a leadership role in discussing and addressing problems during TSG meetings and helped to "advance initiative[s] that where [sic] stagnating for years." Compl. ¶ 22. Plaintiff's laptop was also upgraded,

a perk that was usually reserved only for vice presidents. Compl. ¶ 23. By September 2015, he had obtained security clearance and was eligible to be kept on as a full-time employee. Compl. ¶ 20.

After Plaintiff began to receive such praise and recognition, Crouch frequently called him into her office "to chastise him for minor oversights or issues" which were not his responsibility. Compl. ¶ 24. "These meetings would quickly degenerate into Crouch yelling and berating Plaintiff without provocation." *Id.* On one occasion, Crouch called Plaintiff into her office and "directed him to 'display less leadership' at TSG meetings." Compl. ¶ 18. Caucasian employees, on the other hand, were encouraged to share their ideas. Pl.'s Opp. at 4.

Plaintiff alleges on information and belief that, throughout his time at the bank, he was surveilled by three armed police officers who were stationed at desks surrounding his cubicle. Compl. ¶¶ 56, 58; Pl.'s Opp. at 7. Although the three "officers" introduced themselves as members of another technology group, the nameplates at their cubicles did not match their actual names. Compl. ¶¶ 56, 58. Plaintiff alleges that other Caucasian employees who had security clearances, as well as Caucasian employees "in the surrounding area," were not similarly monitored. Compl. ¶ 57; Pl.'s Opp. at 7.

In early December 2015, Crouch updated Plaintiff's Active Directory ("AD") account with an end date for his employment contract. Compl. ¶ 27.[4] Plaintiff asked Crouch why she had updated his AD account, given that he was eligible to remain as a full-time employee. Compl. ¶¶ 27-28. Although Crouch did not provide an explanation, Plaintiff believed it to be "an intimidation tactic to ensure [he] would heed Crouch's warning to 'display less leadership.'" Compl. ¶ 28.

On the evening of December 9, 2015, a man arrived at the building in which Plaintiff lived with what the man claimed was a food delivery for Plaintiff. Compl. ¶ 29. Plaintiff told the man he

---

[4] In the fifth amended complaint, Plaintiff alleges that the AD account was updated in December 2016. Compl. ¶ 27. However, based on his other allegations, it appears that he intended to allege that this occurred in December 2015.

had not placed an order. *Id.* Nonetheless, the delivery man knocked on Plaintiff's door and rang the doorbell a few times before eventually leaving. *Id.* Plaintiff called the NYPD. Compl. ¶ 30. Plaintiff was concerned because he had classified information in his possession. *Id.* The following day, Plaintiff reported the incident to the New York Fed Police, at the request of New York Fed Vice President Carl Lundgren. Compl. ¶ 31. Neither the NYPD nor the New York Fed conducted an investigation. Compl. ¶ 32.

Various employees openly suspected Crouch as having been involved in the food delivery incident. Compl. ¶ 33. Shortly thereafter, Crouch was removed from her position as Plaintiff's supervisor. *Id.*

### B. Plaintiff's Arrest and Termination

On or around December 16, 2015, Plaintiff purchased two Tasers and two key-chain-sized canisters of pepper sprays. Compl. ¶ 34. He purchased these for his and his family's protection. *Id.*

When Plaintiff reported to work at the New York Fed on December 23, 2015, he brought his personal luggage with him because he planned to travel to Virginia that evening to spend Christmas with his family. Compl. ¶ 35. His luggage contained one of the Tasers and a canister of pepper spray that he had recently purchased. *Id.* When Plaintiff arrived at work, he reported that there was a Taser and pepper spray in his luggage. Compl. ¶ 36. The New York Fed Police informed Plaintiff that those items were not permitted in New York State and that the officers would have to confiscate and destroy them. *Id.* Plaintiff turned them over with no objection and apologized for his error. Compl. ¶ 37. He was asked to wait as Crouch, who was still listed in the system as his manager, was contacted. Compl. ¶ 39. The New York Fed Police assured Plaintiff that such an incident had occurred before and was "no big deal." Compl. ¶ 38.

Shortly thereafter, former NYPD commissioner Bill Bratton arrived on scene. Compl. ¶ 40. He was "extremely angry" at Plaintiff "as if [Plaintiff] had committed a very grave crime." *Id.*

Plaintiff alleges that Bratton's "tone and intensity where [sic] both geared toward making the Plaintiff feel intimidated and scared." Compl. ¶ 41. The police then arrived and, at Bratton's command, NYPD officers handcuffed and arrested Plaintiff and took him to the police precinct. Compl. ¶ 42-43.

Plaintiff's release from police custody "was delayed because 'someone from the Federal Reserve was pressuring for Plaintiff to be held in police custody'" and "calling to make [the incident] a bigger deal than" it was. Compl. ¶ 43. Plaintiff was issued two Class C Summonses for possession of the Taser and pepper spray and released. Compl. ¶ 44.

After being released, Plaintiff returned to the New York Fed to report to work, but the New York Fed Police refused to let him into the building. Compl. ¶ 46. One officer suggested that Plaintiff contact Crouch and ask for permission to enter. *Id.* Plaintiff called Crouch on her cellphone, but she told him that it was up to the New York Fed Police to allow him into the building. Compl. ¶ 47.

Plaintiff contacted Soft, Inc., which informed him that Crouch was "weighing whether or not [Plaintiff] should be fired for being arrested for having a taser in his luggage that morning" and directed him to go home and wait for further instruction. Compl. ¶¶ 48-49. When Plaintiff arrived home, he logged into his work email and found an email that had been sent by Crouch immediately after his arrest that morning announcing that Plaintiff was no longer employed by the New York Fed. Compl. ¶ 50. Later that day, Soft Inc. officially notified him that he had been terminated because of the incident. Compl. ¶ 51.

The summonses against Plaintiff were eventually dismissed by a state court as "legally insufficient." Compl. ¶ 44. After the dismissal, one of the NYPD officers who had arrested Plaintiff told him "to be careful because the man who ordered his arrest was Police Commissioner Bill Bratton and that Plaintiff should continue to make sure he is very polite and carefully [sic] if he

has to address him again." Compl. ¶ 45.

Plaintiff alleges that, as a result of the racial discrimination he was subjected to, he has suffered financial, emotional, and physical damages and a "devastation of [his] life and career." Compl. ¶ 60.

### C. Procedural History

Plaintiff initiated this action on January 27, 2016. ECF No. 2. After a series of amendments, Defendant moved to dismiss the fourth amended complaint. ECF No. 45. The Court granted Defendant's motion and dismissed the fourth amended complaint on June 12, 2017. ECF No. 50. The Court granted Plaintiff leave to replead by July 11, 2017. *Id.* Plaintiff filed his fifth amended complaint on June 30, 2017 against Defendants the New York Fed, the NYPD, and former NYPD Commissioner Bill Bratton. ECF No. 51. He alleges that the New York Fed discriminated against him based on his race and national origin, in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). *Id.* Plaintiff also alleges that he was unlawfully subjected to a hostile work environment. *Id.*

Defendant moved to dismiss Plaintiff's fifth amended complaint in its entirety on August 17, 2017. ECF No. 56. Plaintiff filed an opposition on September 11, 2017, ECF No. 60, and Defendant filed its reply on September 18, 2017, ECF No. 61.

## II.  STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not

enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions . . . are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

Because he is proceeding *pro se*, the Court must liberally construe Plaintiff's allegations and "interpret[ ] [them] to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam); *see also, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed . . . ."); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where . . . the complaint was filed *pro se*, it must be construed liberally to raise the strongest claims it suggests." (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)). Nevertheless, "dismissal of a *pro se* complaint is [ ] appropriate where a plaintiff has clearly failed to

meet the minimum pleading requirements." *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)).

## III.    DISCUSSION

### A.   Claims Against the New York Fed

Plaintiff's fifth amended complaint and opposition repeat the allegations laid out in the fourth amended complaint (ECF No. 29) but also plead additional facts. Construed liberally, Plaintiff's submissions raise claims against New York Fed under federal and New York law for (1) employment discrimination on the basis of race, color, and national origin; and (2) a hostile work environment. The Court will address each claim in turn.

#### 1.   Title VII Race, Color, and National-Origin Discrimination

To state a claim for employment discrimination pursuant to Title VII absent direct evidence of discrimination, a plaintiff must allege facts sufficient to plausibly support the inference that he (1) is a member of a protected class; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) has "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). With respect to the fourth element, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Id.*; *see Swierkiewicz v. Sorenma N.A.*, 534 U.S. 506, 511, 515 (2002) (holding that "an employment discrimination plaintiff need not plead a prima facie case of discrimination" and noting that the United States Supreme Court "has never indicated that the requirements for establishing a prima facie case under [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)] also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss").

To satisfy the minimal burden established by *Littlejohn*, "a plaintiff must plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. District*, 801 F.3d 72, 86 (2d Cir. 2015). That is, a plaintiff must allege that "the employer took adverse action against [him] at least in part for a discriminatory reason, and [he] may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87.

Here, Defendant concedes that Plaintiff has adequately alleged the first three elements identified by *Littlejohn* but argues that he has failed to show the minimal inference of discrimination necessary to plausibly allege the fourth element. However, because the complaint plausibly alleges the existence of similarly situated comparators who were treated less well than Mr. Nguedi, the Court concludes that he has met his pleading burden.

### a. Adverse Employment Action

Plaintiff plausibly alleges that the New York Fed took adverse action against him by terminating his employment. *See Vega*, 801 F.3d at 85 ("Examples of materially adverse changes include termination of employment . . . ." (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)); *see also Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 468 (S.D.N.Y. 2017) (concluding that an assertion that an employee was terminated was "plainly sufficient to plausibly allege an adverse employment action"). This established, the Court considers the sufficiency of the facts that Mr. Nguedi presents to raise an inference of discrimination.

### b. Plausible Inference of Discrimination

Mr. Nguedi's complaint provides the "minimal support" required to suggest that his employer was motivated by discriminatory intent by alleging the existence of similarly situated comparable Caucasians who were treated better than he. Defendant asserts that the facts pleaded by

Plaintiff are insufficient to meet his pleading burden because Plaintiff fails to allege sufficient facts to establish that the employees outside of Plaintiff's protected classes were similarly situated to him in all material respects.  In this regard, Defendant contends that Plaintiff has failed to allege that the comparator employees (1) had similar job descriptions or responsibilities and (2) had "engaged in conduct of comparable seriousness" to Plaintiff's attempt to enter the New York Fed with a Taser. Def.'s Mem. at 9.  As the Court will explain after a brief aside, the facts alleged in the complaint are sufficient to meet Plaintiff's minimal burden.

While the Court need not reach the issue to resolve this motion, the Court recognizes that following *Littlejohn*, there appears to be a developing question in the Circuit regarding the degree of factual detail a plaintiff must include in a complaint regarding similarly situated comparators:  must a plaintiff allege specific facts showing that the comparators are similarly situated in all material respects or are less detailed notice pleadings regarding relevant comparators sufficient to give rise to an inference of discrimination?  *Compare Yang v. Dep't of Educ. of the City of N.Y.*, No. 14-cv-7037, 2016 WL 4028131, at *9 (E.D.N.Y. July 26, 2016) (stating that "the law does not require detailed pleadings regarding the similarly situated comparators"), *with Batiste v. City Univ. of N.Y.*, No. 16-cv-3358, 2017 WL 2912525, at *9 (S.D.N.Y. July 7, 2017) (holding that "a plaintiff claiming disparate treatment must *allege* facts to establish that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" (emphasis added) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).

Perhaps ironically, given *Littlejohn*'s emphasis on the minimal nature of a plaintiff's pleading burden, district court decisions that suggest that a more lenient pleading standard is appropriate with respect to the existence of similarly situated comparators point to *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014), which predated *Littlejohn*, whereas the cases that hold that a plaintiff must plead more specific facts showing that the comparators are similarly situated in all material respects

point to *Littlejohn* itself. They appear to do so because *Littlejohn* cites with approbation to *Mandell*, which in turn cites to *Graham v. Long Island R.R.*, 230 F.3d 34, 36 (2d Cir. 2000). But both *Mandell* and *Graham* were summary judgment decisions, setting forth the elements of a *prima facie* case under the *McDonnell Douglas*[5] framework. *See Mandell*, 316 F.3d at 379 ("A showing of disparate treatment—that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case. A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" (quoting *Graham*, 230 F.3d at 39)). Yet the Supreme Court's decision in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), and *Littlejohn* itself, make it clear that a heightened pleading standard—one that requires a plaintiff to plead all of the elements of a *prima facie* case, as opposed to a more simplified notice pleading—is inappropriate.

It is not clear to the Court that *Littlejohn's* favorable citation to *Mandell* endorsed a requirement that a plaintiff plead specific facts sufficient to show that the comparators are similarly situated to the plaintiff "in all material respects," as *Mandell* and *Graham* required for a plaintiff to establish a *prima facie* case under the *McDonnell Douglas* framework. The panel in *Littlejohn* found Ms. Littlejohn's allegations regarding "adverse employment actions taken against other employees who worked for different agencies and who had different jobs" to be insufficient to raise such an inference, noting that "adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination." *Littlejohn*, 795 F.3d at 312 (citing *Mandell*, 316 F.3d at 379). But because Ms. Littlejohn's alleged comparators were so far removed from her job, the court did not need to apply *Mandell's* requirement that comparators be similar in all material respects in order to dismiss Ms. Littlejohn's claims.

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The Court recognizes that in a number of non-precedential decisions following *Littlejohn*, the Second Circuit has applied the *Mandell/Graham* standard to evaluate the sufficiency of pleadings regarding similarly situated comparators. Those decisions judge the sufficiency of pleadings based, among other things, on whether they allege that the plaintiff and comparator employees had similar job descriptions or engaged in the same prohibited conduct. *See, e.g., Kpaka v. City Univ. of N.Y.*, ___ Fed. App'x ___, 2017 WL 3866642, at *1 (2d Cir. Sept. 5, 2017) (summary order) (citing to *Mandell* and concluding that allegations of racial discrimination, if not time-barred, were nonetheless deficient because they did not demonstrate that the plaintiff was "similarly situated to the [comparator] employee in question"); *Marcus v. Leviton Mfg. Co., Inc.*, 661 Fed. App'x 29, 32 (2d Cir. 2016) (summary order) ("Without any information as to whether [the comparator] employees were otherwise similarly situated or the specifics of their conduct, the mere allegation that two other employees—one younger and one similar in age—used profanity without being fired does not give rise to even a minimal inference of age discrimination."); *Johnson v. Andy Frain Servs., Inc.*, 638 Fed. App'x 68, 70 (2d Cir. 2016) (summary order) (citing to *Mandell* and noting that the plaintiff's "third amended complaint did not allege that she and her co-worker had similar job descriptions or responsibilities," but electing not to consider the plaintiff's allegations on that score because they were first raised on appeal); *Dooley v. JetBlue Airways Corp.*, 636 Fed. App'x 16, 20 (2d Cir. 2015) (summary order) (affirming dismissal of Title VII discrimination claim because the complaint failed to allege that the plaintiff and the alleged comparator employees had engaged in "comparable conduct, that is conduct of comparable seriousness" (quoting *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014)). The principal case that defendant cites as support for its position in this case— *Batiste v. City University of New York*, No. 16-cv-3358, 2017 WL 2912525, at *9 (S.D.N.Y. July 7, 2017) —relied on these non-precedential decisions to hold affirmatively that *Mandell's* articulation of the required showing regarding comparators for the establishment a *prima facie* case establishes a

minimum pleading standard.

In light of the minimal pleading standard pronounced by the Supreme Court in *Swierkiewicz*, it is unclear whether in a precedential decision the Second Circuit would, like *Batiste*, require a plaintiff to plead the precise job descriptions or responsibilities of comparator employees, or to plead the specifics of conduct in which comparator employees engaged that may be similarly serious to the plaintiff's conduct. The Circuit might, instead, conclude that requiring a plaintiff to plead specific facts regarding such details is an undue burden "[b]efore discovery has unearthed relevant facts and evidence" and that more simplified notice pleading is sufficient. *Swierkiewicz*, 534 U.S. at 512. However, this is a question the Court need not resolve here. Whatever the effect of *Littlejohn* on the pleading standards regarding similarly situated comparators may be, the Court does not understand *Littlejohn* to have made the pleading standard for discrimination claims more rigorous than it was previously. Applying the standard articulated by the Circuit in *Brown*, 756 F.3d at 230, Mr. Nguedi's complaint passes muster; drawing all inferences in plaintiff's favor, it nudges across the line even under the more stringent view of the pleading requirements articulated in *Batiste*.

Plaintiff alleges sufficient facts that plausibly suggest his race, color, and national origin were at least motivating factors in his termination. First, unlike Plaintiff's fourth amended complaint, which contained no allegations of disparate treatment, *see Nguedi v. Fed. Reserve Bank of N.Y.*, No. 16-cv-636, 2017 WL 2557263, at *5 (S.D.N.Y. June 12, 2017), the fifth amended complaint pleads facts that, taken as true, suggest that Plaintiff's immediate supervisor gave preferential treatment to employees outside of Plaintiff's protected classes. *See Littlejohn*, 795 F.3d at 312 ("An inference of discrimination can arise from circumstances including, but not limited to, . . . the more favorable treatment of employees not in the protected group . . . ."). Plaintiff alleges that Crouch treated him—the only African American employee under Crouch's supervision—differently than Caucasian employees in various respects. Plaintiff alleges that Caucasian employees in his "area" and who had

also obtained security clearances were not surrounded by armed police officers to surveil them like he was. Compl. ¶ 57. Plaintiff also asserts that Crouch would generally resolve issues like the ID photograph incident for Caucasian employees by making a simple phone call. Pl.'s Opp. at 5. And Plaintiff further alleges that Caucasian employees were encouraged to share ideas, whereas Crouch told him to display less leadership. Compl. ¶ 18; Pl.'s Opp. at 7.

Second, Plaintiff's allegations with respect to the comparator Caucasian employees plausibly suggest that those employees are similarly situated to him. With all inferences drawn in Plaintiff's favor and Plaintiff's submissions construed liberally, Plaintiff alleges that the comparator employees were also under Crouch's supervision—he pleads that he was the only African American who worked under Crouch, that Crouch handled the comparator employees' administrative issues, and comparator employees were in his same "area." Compl. ¶ 19. Plaintiff also plausibly alleges that the comparators were subject to the same standards, as he pleads that they, like he, had obtained security clearances. Pl.'s Opp. at 7. Although Plaintiff does not allege in detail that other employees engaged in conduct similar to his attempt to enter the New York Fed with a Taser, he does state that the Fed police told him that "this type of incident had happened before." Compl. ¶ 38. Any specific information concerning the employees that were involved in those previous incidents, or related to disciplinary action taken against the other Caucasian comparators, is likely to be developed during discovery and will be more appropriately considered at later stages of the litigation. *Brown*, 756 F.3d at 230 ("Ordinarily, [w]hether two employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss." (quoting *Graham*, 230 F.3d at 39)).

Therefore, the Court concludes that Plaintiff's fifth amended complaint plausibly suggests that Plaintiff was treated less favorably than those outside of his protected classes, and that this mistreatment was at least in part motivated by unlawful discrimination. Plaintiff thus raises an

inference of discrimination sufficient to withstand a motion to dismiss.  *See Brown*, 756 F.3d at 230.[6]

Defendant's motion to dismiss the Title VII discrimination claim is denied.

### 2.  Title VII Hostile Work Environment

While Plaintiff's Title VII discrimination claim survives, his hostile work environment claim does not share the same fate.  "To state a hostile work environment claim in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct:  (1) is objectively severe or pervasive—that is, . . . [the conduct] creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of [any characteristic protected by Title VII]."  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)).  "To establish a hostile work environment under Title VII, . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris v. Forklift Sys., Inc.*,

---

[6] Plaintiff's allegations related to the actions and comments of other bank employees by themselves do not sufficiently give rise to an inference of discrimination.  Plaintiff alleges that the clerk responsible for issuing his ID badge made an overtly racial comment.  However, Plaintiff fails to allege any facts that suggest that the clerk was a decision-maker for the New York Fed or that her remark had any connection to the decision to terminate Plaintiff's employment.  *See Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) ("In determining whether a remark is probative, [courts in this circuit] have considered four factors:  (1) who made the remark (i.e. a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process.");  *Yan v. Ziba Mode Inc.*, No. 15-cv-47, 2016 WL 1276456, at *4 (S.D.N.Y. Mar. 29, 2016) (noting that "verbal comments may evince discriminatory motivation when a plaintiff shows that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff" (internal quotation marks and citation omitted)).  Plaintiff also fails to plead any connection between the cafeteria worker's conduct and any decision-making processes related to his employment.  Although Plaintiff is not required at this stage to prove that discrimination was the ultimate reason for his termination, he is required to plausibly allege that discrimination played at least a partial role in the adverse employment action.  *Vega*, 801 F.3d at 86.  Because Plaintiff's fifth amended complaint contains nothing to suggest that the conduct of these other workers was tied in any way to Plaintiff's employment status, the allegations with respect to those employees alone do not give rise to an inference of discrimination for purposes of Plaintiff's Title VII discrimination claim.  *Cf. Green*, 248 F. Supp. 3d at 464, 468-69 (finding inference of discrimination created by allegation that employees of the defendant suggested that the employer "should not have monkeys up front" where those employees were also involved in the decision to terminate the plaintiff's employment).

510 U.S. 17, 21 (1993)).  The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* at 321 (quoting *Raspardo*, 770 F.3d at 114).  In determining whether a plaintiff sufficiently alleges a hostile work environment, a court "must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23).

Construed liberally, Plaintiff's hostile work environment claim is predicated on the following allegations:  the ID clerk's failure to greet or acknowledge Plaintiff until after she had attended to "all the other white patrons"; the ID clerk's photograph of Plaintiff taken without warning and the clerk's subsequent refusal to issue a new ID badge; the ID clerk's comments that "we don't serve black people" and "maybe we need a sign"; the cafeteria cashier's one-time refusal to attend to Plaintiff; Crouch's laughter at Plaintiff's ID badge and refusal to help him obtain a new picture; Crouch's remark to display less leadership; Crouch's frequent chastisement of Plaintiff for "minor oversights"; Crouch's "yelling and berating"; Plaintiff's surveillance by armed police officers; Crouch's involvement in sending a delivery man to Plaintiff's residence; and Crouch's updating of Plaintiff's AD account.

Certainly some of these allegations could be deemed offensive, particularly the racial comment by the clerk.  However, a single derogatory remark is insufficient to create a hostile work environment.  *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be 'more than a few isolated incidents of racial enmity.'" (quoting *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir. 1986))); *Green*, 248 F. Supp. 3d at 470 (finding hostile work environment claim sufficiently pleaded where the complaint alleged that defendants made "multiple comments" about employees "not fitting the

image of the store" and referred to the plaintiff in racially discriminatory terms "multiple times"); *see also Harris*, 510 U.S. at 21 ("[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." (internal quotation marks and citation omitted)).

Furthermore, Plaintiff's allegations regarding Crouch's conduct fail to meet the objective pleading requirement, as they do not suggest a "hostile work environment that is so severe or pervasive as to have altered the conditions of" Plaintiff's employment. *Littlejohn*, 795 F.3d at 321; *see id.* (concluding that the plaintiff failed to state a hostile work environment claim where the complaint pleaded that the defendants made "negative statements" about the plaintiff; were "impatient and used harsh tones" with the plaintiff; declined to meet with the plaintiff; replaced the plaintiff at meetings; wrongfully reprimanded the plaintiff; and increased the plaintiff's reporting schedule); *Mira v. Argus Media*, No. 15-cv-9990, 2017 WL 1184302, at *6 (S.D.N.Y. Mar. 29, 2017) (dismissing hostile work environment claim based on: allegations that the plaintiff's coworkers "gradually became more guarded and reserved around her"; remarks made by various employees over the course of the plaintiff's employment that she interpreted as "allusions to her personal life and private conversations"; the plaintiff being greeted in the office in a "highly personal, sexualized voice tone"; and a comment about the role that another employee's ancestors had "in driving Mexicans out of Texas"); *see also Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp. 2d 520, 536 (S.D.N.Y. 2008) ("'Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support' a hostile work environment claim." (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004)).

Therefore, Plaintiff's hostile work environment claim is dismissed.

### 3. New York State Human Rights Law Claim[7]

Discrimination claims under the NYSHRL are subject to the same standard as Title VII claims. *Patane*, 508 F.3d at 113; *Salazar v. Ferrara Bros. Bldg. Materials Corp.*, No. 13-cv-3038, 2015 WL 1535698, at *5 (E.D.N.Y. Apr. 6, 2015). Therefore, Plaintiff's NYSHRL discrimination claim survives dismissal for the reasons described in Section III.A.1, *supra*.

### 4. New York City Human Rights Law Claim

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . race, . . . color[, or] national origin . . . of any person, . . . to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). A plaintiff may bring claims under the NYCHRL for both discrimination and hostile work environment. *See Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 658 (E.D.N.Y. 2015). "Because claims for hostile work environment and discrimination are governed by the same provision of the NYCHRL, they are analyzed under the same standard." *Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 246 (E.D.N.Y. 2015).

Unlike Title VII, the NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.,* No. 14-cv-155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 114 (2d Cir. 2013)). Instead, the proper inquiry under the NYCHRL is whether the plaintiff "was treated 'less well' because of her [membership in a protected class]." *Pena-*

---

[7] Ordinarily, the Court would decline to exercise supplemental jurisdiction over state law claims where, as here, all federal claims have been dismissed and there is no diversity of citizenship between the parties. However, the Court retains original subject matter jurisdiction over Plaintiff's state law claims in this instance because, pursuant to federal statute, "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States." 12 U.S.C. § 632.

*Barrero v. City of New York*, No. 14-cv-9550, 2017 WL 1194477, at \*15 (S.D.N.Y. Mar. 30, 2017) (quoting *Mihalik,* 715 F.3d at 111).

The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik,* 715 F.3d at 109 (quoting *Albunio v. City of New York,* 16 N.Y.3d 472, 477-78 (Ct. App. 2011)). "The Court considers the totality of the circumstances, and while courts may dismiss truly insubstantial cases, even a single comment may be actionable in the proper context." *Bacchus*, 137 F. Supp. 3d at 245. Nonetheless, the NYCHRL "is not a 'general civility code.'" *Mihalik,* 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.,* 872 N.Y.S. 2d 27, 40-41 (App. Div. 1st Dep't 2009)). "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive. It is not enough that a plaintiff has an overbearing or obnoxious boss. [He] must show that [he] has been treated less well at least in part 'because of [his protected characteristic].'" *Id.* (citing *Williams,* 872 N.Y.S. 2d at 39, 40 n.27).

Here, Plaintiff plausibly alleges claims under the NYCHRL. Under the NYCHRL, "an employer is strictly liable for the unlawful harassment of employees by their supervisors or managers, regardless of whether the harassment culminates in a tangible employment action." *Dillon*, 85 F. Supp. 3d at 657 (citing *Zakrzewska v. New Sch.*, 14 N.Y.3d 469, 473 (Ct. App. 2010)). "The plain language of [section] 8-107 . . . creates vicarious liability for the acts of managerial and supervisory employees even where the employer has exercised reasonable care to prevent and correct any discriminatory actions and even where the aggrieved employee unreasonably has failed to take advantage of employer-offered corrective opportunities." *Zakrzewska*, 14 N.Y.3d at 478. Therefore, the New York Fed is strictly liable for any of Crouch's actions performed in her supervisory capacity that violated the NYCHRL.

As discussed earlier, Plaintiff alleges that Crouch told him to show less leadership and berated him while encouraging Caucasian employees to share their ideas. He also alleges that he was

monitored by armed police officers throughout the workday, whereas Caucasian employees with the same security clearance were not. Plaintiff further pleads that Crouch would help Caucasian employees to resolve issues like the ID incident, but refused to help him and instead passed his photograph around while laughing at him. Therefore, Plaintiff plausibly alleges that Crouch treated him "less well" than other similarly situated employees outside of his protected classes. *See Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 379 (S.D.N.Y. 2014) (finding the denial of workplace training sufficiently adverse under the NYCHRL even though it did not affect the plaintiff's wages or chances for promotion); *Bacchus*, 137 F. Supp. 3d at 246 (denying summary judgment when the plaintiff produced evidence that her supervisor mimicked her accent, gave her a disproportionate workload, and disciplined her for conduct that other employees were not disciplined for); *Baez v. Anne Fontaine USA, Inc.*, No. 14-cv-6621, 2017 WL 57858, at *5 (S.D.N.Y. Jan. 5, 2017) (finding sufficient evidence to support NYCHRL "aider and abettor" liability claim when plaintiff asserted that her coworkers spread a rumor that she went bra-less to a meeting and plaintiff's supervisor failed to sufficiently investigate or discipline employees for the rumor); *Goonewardena v. N.Y. State Workers' Comp. Bd.*, No. 09-cv-8244, 2016 WL 7439414, at *18 (S.D.N.Y. Feb. 9, 2016) (concluding that the plaintiff presented a prima facie NYCHRL claim when he produced evidence that he was denied training, yelled at, had a probationary report thrown in his face, and referred to as being "black . . . not white"). Accordingly, Plaintiff's NYCHRL claim based on Crouch's conduct survives.[8]

---

[8] In its motion papers, the New York Fed argues that Plaintiff's state and local law claims are preempted by the Federal Reserve Act, 12 U.S.C. § 341 (Fifth). That statute provides that the Federal Reserve Bank has power "to appoint by its board of directors a president, vice presidents, and such officers and employees as are not otherwise provided for in this Act, to define their duties, require bonds for them and fix the penalty thereof, *and to dismiss as pleasure such officers and employees.*" 12 U.S.C. § 341(Fifth) (emphasis added). During a conference on November 7, 2017, the Court noted on the record that the preemption issue was not fully briefed in the parties' submissions. Accordingly, the Court gave the New York Fed the choice to either pursue the preemption argument at this stage, with anticipated supplemental briefing to be ordered, or to preserve the preemption argument for later stages of the litigation. On November 13, 2017, the New York Fed filed a letter stating that it will not pursue its preemption argument at this time, but preserves the argument for a later stage of the case. ECF No. 64. Accordingly, the Court will not address the preemption question at this stage, and

The fifth amended complaint may also be construed to allege that the cafeteria employee and the ID clerk also violated the provisions of the NYCHRL. While individual employees may be held liable under the NYCHRL for creating a hostile work environment, an employer is only liable for the discriminatory conduct of an employee "where the employee or agent exercised managerial or supervisory responsibility." N.Y.C. Admin. Code § 8-107(13)(b)(1). Because the cafeteria employee and the ID clerk are not Plaintiff's supervisors, the New York Fed is not vicariously liable under the NYCHRL for their actions. Accordingly, to the extent the NYCHRL claim is related to actions or comments by those employees, it is dismissed.

### B. Claims Against Bill Bratton and the NYPD

Plaintiff's Fifth Amended Complaint names former NYPD Police Commissioner Bill Bratton and the NYPD as defendants. Plaintiff does not articulate the cause of action he brings against these defendants, but to the extent that his allegations can be read to plead a claim for false arrest, that claim was previously dismissed by the Court with prejudice. *See Nguedi*, 2017 WL 2557263, at *7.

To the extent that Plaintiff asserts employment discrimination claims against Mr. Bratton or the NYPD, these claims cannot be upheld because Plaintiff does not allege that Mr. Bratton or the NYPD were his employers. Moreover, Mr. Bratton and the NYPD are not properly parties to this suit. It is well-settled that the NYPD is not a proper defendant in any suit, as it is "a non-suable agency of the City" of New York. *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). Furthermore, the Court granted Plaintiff leave to amend his complaint "solely with respect to those claims that were not dismissed with prejudice, to correct the deficiencies identified in [the Court's June 12, 2017] opinion." *Nguedi*, 2017 WL 2557263, at *8. New allegations against new defendants

---

Defendant may raise it anew at later stages of the litigation.

were not within the scope of that leave to amend.

Therefore, Plaintiff's claims against Mr. Bratton and the NYPD are dismissed.

## IV.    CONCLUSION

For the reasons stated above, the New York Fed's motion to dismiss is granted in part and denied in part. Plaintiff's Title VII discrimination claim, NYSHRL discrimination claim, and NYCHRL claim, to the extent the NYCHRL claim is based on Crouch's conduct, survive. Plaintiff's Title VII hostile work environment claim, NYCHRL claim premised on the cafeteria worker's and ID clerk's conduct, and claims against the NYPD and Mr. Bratton are dismissed.

The Court does not grant Plaintiff leave to amend his complaint with respect to the dismissed claims, as Plaintiff has already had two opportunities to cure deficiencies raised in his previous pleading. *See Rutolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("Leave to amend, though liberally granted, may properly be denied for . . . repeated failure to cure deficiencies by amendments previously allowed . . . .").

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal by Plaintiff from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court requests that counsel for Defendant provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is instructed to terminate the motion pending at docket number 56 and to mail Plaintiff a copy of this order by certified mail and by regular, first-class mail.

SO ORDERED.

Dated:  December 1, 2017  
New York, New York

_____  
GREGORY N. WOODS  
United States District Judge

23