```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
GERARD NGUEDI,                                                    :
                                                                  :
                            Plaintiff,                            :   Civ. No.: 16-Civ-636 (GHW)
                                                                  :
      - against -                                                 :
                                                                  :
THE FEDERAL RESERVE BANK OF NEW YORK,                             :
                                                                  :
                            Defendant.                            :
                                                                  :
------------------------------------------------------------------X
```

**DEFENDANT FEDERAL RESERVE BANK OF NEW YORK'S STATEMENT OF UNDISPUTED MATERIAL FACTS UNDER LOCAL CIVIL RULE 56.1**

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant the Federal Reserve Bank of New York (the "New York Fed") respectfully submits this statement of undisputed material facts in support of its motion for summary judgment, dated June 1, 2018.

**A. Plaintiff's Retention as a Temporary Contingent Worker at the New York Fed**

1.  Donna Crouch is a Vice President at the New York Fed who in 2015 led the Project Management Office of the Electronic Payments Function ("Electronic Payments"). Declaration of Donna Crouch ("DC Decl.") ¶ 2. The Project Management Office assisted Electronic Payments with the logistics of planning and executing projects. DC Decl. ¶ 3.

2.  Among other things, Electronic Payments helped the New York Fed provide a wide range of payment services for financial institutions and the U.S. government. DC Decl. ¶ 4.

3.  In May 2015, Ms. Crouch asked Frankois Alburquerque of the Contingent Workforce Office in the New York Fed's Human Resources Group for assistance in temporarily engaging a contingent worker for a period of six months to meet the Project Management Office's short-term staffing needs in connection with an upcoming project. Declaration of

Frankois Alburquerque ("FA Decl.") ¶¶ 13-14; DC Decl. ¶¶ 5-7.

4. New York Fed contingent workers include individuals employed by external staffing agencies that contract with the New York Fed to fill short-term staffing gaps or to provide services in connection with specific projects. FA Decl. ¶ 3.

5. New York Fed employees and contingent workers are subject to different human resources policies, including disciplinary policies. The termination process for employees may include an official warning process, a rehabilitation period, and ultimately a memorandum recommending dismissal. FA Decl. ¶¶ 10-12; FA Decl. Ex. B ¶¶ 19-24. Contingent workers are not subject to any such procedures. FA Decl. ¶ 10; FA Decl. Ex. A ¶ 25.

6. After considering eleven candidates, Ms. Crouch sought to engage the services of Plaintiff, who was submitted for consideration by the staffing agency Source of Future Technology Inc. ("SOFT"). FA Decl. ¶¶ 16-18; DC Decl. ¶¶ 8-12; Declaration of Gail Armendinger ("GA Decl.") ¶¶ 4-5.

7. Ms. Crouch's decision was made after multiple telephonic and in-person interviews of Plaintiff. FA Decl. ¶ 17; DC Decl. ¶¶ 8-10.

8. In response to the New York Fed's offer, SOFT asked the New York Fed for a higher hourly pay rate for Plaintiff's services, because Plaintiff had asked SOFT to pay him a higher hourly rate for the assignment at the New York Fed. DC Decl. ¶ 12; Pl. Dep. 23:10-14.[1] To ensure that Plaintiff's services were engaged, Ms. Crouch obtained approval to pay SOFT the requested higher rate, and SOFT thereafter accepted the New York Fed's offer on July 3, 2015. DC Decl. ¶¶ 12-13; Pl. Dep. 23:15-17; FA Decl. ¶ 20.

---

[1] "Pl. Dep." refers to the transcript of Plaintiff's April 13, 2018 deposition. Relevant excerpts of the transcript are included in Exhibit A to the Declaration of Michael M. Brennan.

**B. The Contracts Governing Plaintiff's Work Assignment and Its Six-Month Duration**

9. The agreement between SOFT and the New York Fed concerning Plaintiff's work assignment is reflected in a Work Order, dated August 28, 2015 (the "Work Order"). FA Decl. ¶ 21; FA Decl Ex. C; DC Decl. ¶ 13.

10. The Work Order was made pursuant to a Master Staffing Agreement between the New York Fed and SOFT, dated March 23, 2015 (the "Master Staffing Agreement"), and, as stated in the Work Order, the terms of the Master Staffing Agreement are incorporated by reference into the Work Order. FA Decl. ¶ 21; FA Decl. Ex. C at 1 (Work Order); FA Decl. Ex. D (Master Staffing Agreement).

11. Under the Master Staffing Agreement, the New York Fed had the right to terminate the Work Order, and Plaintiff's work assignment under it, "upon notice to [SOFT] given at any time, for any reason or for no reason." FA Decl. ¶ 23; FA Decl. Ex. D ¶ 10.2.

12. The Work Order reflects an expected end date of December 29, 2015 for Plaintiff's work assignment. FA Decl. Ex. C at 1; FA Decl. ¶ 22; DC Decl. ¶ 14.

13. To align the length of the assignment with the original intent of engaging a contingent worker for six months, on September 16, 2015, Ms. Crouch extended the duration of Plaintiff's work assignment to January 29, 2016. DC Decl. ¶ 15; DC Decl. Ex. A; FA Decl. ¶ 22.

14. On November 30, 2015, Ms. Crouch extended the period of time that Plaintiff would have access to the New York Fed's computer systems, from December 31, 2015 through the end of January 2016, so that Plaintiff would not lose access before his work assignment ended. DC Decl. ¶ 16; DC Decl. Ex. B.

**C. Plaintiff's Work Assignment from August 5, 2015 Through December 22, 2015**

15. On August 5, 2015, Plaintiff began providing services to the New York Fed in the

role of a Project Manager in the Electronic Payments Project Management Office. DC Decl. ¶ 17.

16. During the period when Plaintiff provided services to the New York Fed, there were three other people in the Project Management Office: (i) Ms. Crouch; (ii) Kumaresan Krishnasamy, a New York Fed employee who had been with the New York Fed for eight years, and (iii) Srinivas Naikoti, a contingent worker who is no longer providing services to the New York Fed. DC Decl. ¶ 18; GA Decl. ¶ 6.

17. Neither Mr. Krishnasamy nor Mr. Naikoti are Caucasian. Plaintiff testified that they are both "Indians" from "India." Pl. Dep. 38:6-13.

18. Plaintiff, Mr. Krishnasamy and Mr. Naikoti, and no one else, reported to Ms. Crouch during this period. DC Decl. ¶ 19; GA Decl. ¶ 7.

19. Shortly after his work assignment began, Plaintiff participated in training on the New York Fed's Equal Employment Opportunity policy against discrimination on the basis of race, color and national origin, among other protected classes, and was informed of the New York Fed's discrimination complaint procedure. Pl. Dep 38:25-39:9; MB Decl. Exs. B, C at 29-30.

20. During his work assignment, Plaintiff never raised any discrimination concerns through that procedure. Pl. Dep. 88:18-19.

21. Through December 22, 2015, Plaintiff's work performance was satisfactory. DC Decl. ¶ 22.

22. Ms. Crouch interacted with Plaintiff on a regular basis, including by providing feedback on work product and engaging in other work-related correspondence. DC Decl. ¶ 21.

23. On September 29, 2015, Ms. Crouch sent Plaintiff an email telling him that he did

a "[n]ice job" on a status report.  DC Decl. Ex. C.  On October 6, 2015, Ms. Crouch sent Plaintiff an email stating that he could attend a training because it would "help [him] do [his] job at the New York Fed."  *Id.*  On December 17, 2015, Ms. Crouch sent Plaintiff an email granting his request to work from home because he was sick and telling him to "[f]eel better," *Id.*; *see also* DC Decl. ¶ 21.

### D. The Termination of Plaintiff's Work Assignment on December 23, 2015

24. Federal Reserve Law Enforcement is a police force charged with securing the New York Fed.  DH Decl. ¶ 4.  The Law Enforcement Unit at the New York Fed had previously been a Protection Department, but became a Federal Reserve Law Enforcement Unit in the wake of September 11, 2001 in provisions included in the USA PATRIOT Act.  DH Decl. ¶ 3.

25. When entering the New York Fed, the Federal Reserve Law Enforcement requires all non-employee visitors (including contingent workers) to run any bags in their possession through an x-ray machine at a security checkpoint and pass through a metal detector.  DH Decl. ¶ 5.

26. When Plaintiff arrived at the New York Fed on the morning of December 23, 2015 with luggage, prior to running it through an x-ray machine, he informed Federal Reserve Law Enforcement officers at the checkpoint that he possessed a Taser and pepper spray.  DH Decl. ¶ 9; Pl. Dep. 42:14-21.

27. Plaintiff was told by the Federal Reserve Law Enforcement officers that the Taser was illegal in New York State and both it and the pepper spray were confiscated.  Pl. Dep. 47:20-48:2.

28. The Federal Reserve Law Enforcement officers then summoned Delayne Hurley, the Law Enforcement Unit's Director of Uniform Operations, who had never before interacted

with either Ms. Crouch or Plaintiff. DH Decl ¶¶ 8-9. Plaintiff confirmed to Mr. Hurley that he had possessed the confiscated items. DH Decl. ¶ 10.

29. Federal Reserve Law Enforcement's practice is to contact the NYPD when it believes a crime has been committed under New York State law. DH Decl. ¶¶ 6-7. Consistent with that practice, Mr. Hurley instructed a Federal Reserve Law Enforcement officer to inform the NYPD of the situation. DH Decl. ¶ 12.

30. Shortly thereafter, two NYPD officers arrived, took custody of the Taser and pepper spray, placed Plaintiff under arrest, and escorted him out of the New York Fed. DH Decl. ¶ 13.

31. Other than Plaintiff, Mr. Hurley has never encountered any New York Fed employee or contingent worker in possession of a weapon on New York Fed premises that is illegal to possess in New York State. DH Decl. ¶ 21.

32. After the arrest, Mr. Hurley called Ms. Crouch and informed her of the foregoing events, and told her that he considered Mr. Nguedi to be a risk to the New York Fed going forward. DH Decl. ¶¶ 14-15; DC Decl. ¶¶ 23-24.

33. Mr. Hurley's determination was based on the fact that Plaintiff illegally possessed a Taser on New York Fed premises, Plaintiff's demeanor during Mr. Hurley's face-to-face interaction with him, and the fact that Plaintiff was a non-employee contingent worker who did not have a direct or lengthy relationship with the New York Fed. DH Decl. ¶ 16.

34. Based on Mr. Hurley's risk determination and understanding that Plaintiff was a non-employee, Mr. Hurley stated he recommended that Plaintiff's work assignment be terminated. DH Decl. ¶ 17; DC Decl. ¶ 24.

35. Other than Plaintiff, no one who reported to Ms. Crouch has ever possessed a

weapon of any kind on New York Fed premises or has been deemed a risk by Federal Reserve Law Enforcement. DC Decl. ¶ 25.

36.   Ms. Crouch relayed the information she learned from Mr. Hurley to her superior, Gail Armendinger, and they and they agreed to defer to Mr. Hurley's recommendation, given his knowledge and experience in law enforcement. DC Decl. ¶ 26; GA Decl. ¶¶ 9-10.

37.   After speaking with Ms. Crouch, Mr. Hurley called Mr. Alburquerque and requested that he commence the off-boarding process for Plaintiff. DH Decl. ¶ 18; FA Decl. ¶¶ 24-25. The Contingent Workforce Office thereafter communicated to SOFT the New York Fed's decision to terminate the Work Order, thus ending Plaintiff's assignment. FA Decl. ¶ 26.

38.   Ms. Crouch called Mr. Alburquerque to discuss the matter and was told that he had already begun the off-boarding process for Plaintiff after receiving a phone call from Federal Reserve Law Enforcement. DC Decl. ¶ 27; FA Decl. ¶ 27.

**E.   Plaintiff's Testimony in this Action**

39.   Plaintiff testified that he is unaware of any other New York Fed contingent worker or employee who possessed an illegal weapon on New York Fed premises. Pl. Dep. 46:12-47:9.

40.   Plaintiff testified that on December 23, 2015 an unnamed Federal Reserve Law Enforcement officer told him that his possession of the Taser "was no big deal and that stuff like that, it had happened before and nobody was arrested," Pl. Dep. 46:18-21, but no witness or document suggests that any other such incident in fact occurred.

41.   Plaintiff testified that he believes his termination was due to his arrest by the NYPD and he is currently litigating a separate lawsuit against the City of New York in which one of his claims is that the NYPD "made [him] lose his job." Pl. Dep. 144:21-145:2; *see also*

Pl. Dep. 137:14-19 (confirming that his work assignment was terminated "because of the NYPD and Police Commissioner Bratton").

42. Plaintiff testified that he is unaware of "anything that would prevent the New York Fed from being able to terminate [his] work assignment [for] possessing a Taser or pepper spray [on] New York Fed premises." Pl. Dep. 58:2-6.

43. Plaintiff testified that Ms. Crouch yelled at him "every day" of his work assignment in front of "everyone" on the floor," Pl. Dep. 71:13-72:11, but he testified that he could recall only a single interaction because he did not "pay attention" or otherwise could not "remember" any other incidents, Pl. Dep. 78:20-79:6.

44. With respect to the single purported instance that Plaintiff does recall, Plaintiff testified that it involved Ms. Crouch asking him to complete a work-related task that he felt he was "not in a position to do or to do better than [Ms. Crouch]." Pl. Dep. 78:2-9; Pl. Dep. 73:4-74:8.

45. Plaintiff testified that on one occasion Ms. Crouch told him to "show less leadership" at certain work meetings. Pl. Dep. 74:13-16. Plaintiff could not recall any context for this statement, such as when it was made or what else was said during the interaction, other than asking for clarification from Ms. Crouch and not receiving any. Pl. Dep. 75:23-76:6. Plaintiff testified that he "understood" this statement to mean that "as a black person, you don't . . . speak[] in a room full of white people with leadership," but Ms. Crouch never actually said that. Pl. Dep. 76.7-77:8.

46. Plaintiff testified that Ms. Crouch "laugh[ed]" at the photograph on his New York Fed identification badge, but also that other people "smil[ed]" when they saw the picture. Pl. Dep. 67:16-21.

47. Plaintiff testified that Ms. Crouch did not "change" the identification badge picture for him when he asked. Pl. Dep. 68:6-11, but Plaintiff could not identify anyone else who reported to Ms. Crouch who had received assistance from her in getting a photograph retaken or who had received assistance from her in any respect. Pl. Dep. 68:16-71:4.

48. Plaintiff testified that he was monitored by three police officers at the New York Fed "from day one." Pl. Dep. 94:4-15. That belief is based on Plaintiff's assumptions and speculation. Pl. Dep. 94:17-96:23. Plaintiff testified that he did not know who supposedly positioned those officers around his work area. Pl. Dep. 96:24-97:3.

49. No Federal Reserve Law Enforcement officers, or any other law enforcement officers, were ever positioned or stationed in the vicinity of Plaintiff's work area at the New York Fed. DH Decl. ¶ 27; DC Decl. ¶ 28.

Dated: June 1, 2018  
   New York, New York

Respectfully submitted,

/s/ *Michael Brennan*  
Michael M. Brennan  
Katherine S. Landy  
Federal Reserve Bank of New York  
33 Liberty Street  
New York, NY 10045  
(212) 720-8235

*Counsel for Defendant*  
*Federal Reserve Bank of New York*