UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

GERARD NGUEDI,

                Plaintiff,

    - against -

THE FEDERAL RESERVE BANK OF NEW YORK,

                Defendant.

------------------------------------------------------------X

Civ. No.: 16-Civ-636 (GHW)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/9/18

## PLAINTIFF RESPONSE TO DEFENDANT FEDERAL RESERVE BANK OF NEW YORK'S STATEMENT OF UNDISPUTED MATERIAL FACTS UNDER LOCAL CIVIL RULE 56.1

Pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Plaintiff Gerard Nguedi respectfully submits this response to statement of undisputed material facts in response of Defendant motion for summary judgment, dated June 1, 2018.

### A. Plaintiff's Retention as a Temporary Contingent Worker at the New York Fed

1.      Donna Crouch is a Vice President at the New York Fed who in 2015 led the Project Management Office of the Electronic Payments Function ("Electronic Payments"). Declaration of Donna Crouch ("DC Decl.") ¶ 2. The Project Management Office assisted Electronic Payments with the logistics of planning and executing projects. DC Decl. ¶ 3.
PLAINTIFF RESPONSE: **TRUE**

2.      Among other things, Electronic Payments helped the New York Fed provide a

wide range of payment services for financial institutions and the U.S. government.  DC Decl. ¶ 4.

PLAINTIFF RESPONSE: **NOT TRUE**

In August of 2015 during my first week with Defendant, Mrs. Crouch told Plaintiff that the Fedwire application (which is handling trillions everyday) was opening during off hours and during weekends for "certain banks". Mrs. Crouch did not specify which banks and tried to retract her assertion when Plaintiff started asking which banks had those privileges? Plaintiff knows based on that conversation that the Electronic Payment department conducts secret sessions with banks during off hours. Therefore, Plaintiff cannot attest that the official role described above is consistent with the actual actions of the Electronic Payment Department. Defendant admitted "loosing" 9 Trillion dollars to congress, enough money to build an Egyptian Pyramid with $100 bills, all given away by Defendant to Elite Bankers for the implementation of their New World Order agenda.


3.      In May 2015, Mrs. Crouch asked Frankois Alburquerque of the Contingent Workforce Office in the New York Fed's Human Resources Group for assistance in temporarily engaging a contingent worker for a period of six months to meet the Project Management Office's short-term staffing needs in connection with an upcoming project.  Declaration of Frankois Alburquerque ("FA Decl.") ¶¶ 13-14; DC Decl. ¶¶ 5-7.

PLAINTIFF RESPONSE: **NOT TRUE**

During the interview process Plaintiff made it clear to Defendant that Plaintiff is interested in a permanent position only and is currently on a contract to hire with AIG. Plaintiff informed Mrs. Crouch as well as Ms. Robinson and all the interviewers that Plaintiff met that day, making sure that everyone knows Plaintiff is interested in a permanent position and is not interested in leaving his position with AIG for a simple contract. Mrs. Crouch as well as SOFT,

2

Inc repeatedly promised Plaintiff that the contract was turning permanent and reinsured Plaintiff that Defendant will match Plaintiff's current contract at a minimum. Which Defendant did when approving Plaintiff higher rate to match Plaintiff's rate at AIG at $95/Hr but also confirming to plaintiff that the contract will be a contract to hire. Plaintiff later received a contract from SOFT that did not mention verbal agreements made by SOFT and Defendant during the interviews. (Appendix: A).

Plaintiff agreed to leave his contract-to-hire position with AIG, which was going to turn permanent in just a few months to start working with Defendant. Plaintiff only had two requirements, to pass a Security Clearance and perform well. It took Plaintiff some time to realize that the contract Plaintiff received did not contain the verbal agreements made during the interview process or any specifics at all. Plaintiff received offer package in an e-mail with lots of irrelevant and confusing information (Appendix: B). Plaintiff had already gave his two-weeks notice at AIG and was essentially stuck when Mrs. Crouch started sabotaging Plaintiff when Plaintiff started gaining in popularity due to good performances and very good contribution to projects. (Appendix: C)


4.      New York Fed contingent workers include individuals employed by external staffing agencies that contract with the New York Fed to fill short-term staffing gaps or to provide services in connection with specific projects.  FA Decl. ¶ 3.

PLAINTIFF RESPONSE: **NOT TRUE.**

Plaintiff assignment was supposed to turn permanent, the job description indicate a long term contract (Appendix: F). Plaintiff met many different types of employees with consulting badges on secretive floors, construction workers, electricians, IT staff, kitchen staff etc. Based on

3

Plaintiff observations, Defendant uses his contract policy to segregate its workers as in many places such as the kitchen for instance, during the time Plaintiff was working there, there were cooks and other kitchen staff that were consultants but for some reason all the consultants in the kitchen also happened to be African Americans. Including the manager of the kitchen Plaintiff spoke with, Defendant is using contractual frameworks and strategies to target minorities and weaken their position so that they accept to be quiet and obedient when they get mistreated as their job is always on the line. This behavior is specifically true against African American contractors as Plaintiff experienced first-hand.

5.    New York Fed employees and contingent workers are subject to different human resources policies, including disciplinary policies. The termination process for employees may include an official warning process, a rehabilitation period, and ultimately a memorandum recommending dismissal. FA Decl. ¶¶ 10-12; FA Decl. Ex. B ¶¶ 19-24. Contingent workers are not subject to any such procedures. FA Decl. ¶ 10; FA Decl. Ex. A ¶ 25.

PLAINTIFF RESPONSE: **NOT TRUE.**

Plaintiff was not exactly a contingent worker as Plaintiff was on a contract-to-hire and was supposed to become a permanent employee as Defendant promised to match Plaintiff contract with AIG (Appendix: E). Nevertheless, everybody is supposed to be treated with respect and consideration. Saying: "Contingent workers are not subject to any such procedures." with such strong affirmation is just an indication of how brutal and immoral, the treatment Defendant give to their contractors is. Proving Plaintiff's point about contractual strategy and technics to trick minorities into bad and meaningless contracts like the one Plaintiff received (Appendix: D).

These contractors receive contracts similar to the one Plaintiff received and have no

4

stability or job security and can be used and abused without ever giving them a real position, while all white employees are set up with real contracts, not the kind that Plaintiff received.

Furthermore, Plaintiff does not know what programs or policies Defendant uses with New York Fed employees. Based on how Defendant treats contingent workers, Plaintiff does not know, and does not believe, Defendant is treating their permanent employees much better. Plaintiff was not satisfied and regretted leaving his job at AIG from day one at FRBNY. Additionally, Plaintiff does not recall seeing any Feds employee who truly seemed happy.

6.      After considering eleven candidates, Mrs. Crouch sought to engage the services of Plaintiff, who was submitted for consideration by the staffing agency Source of Future Technology Inc. ("SOFT"). FA Decl. ¶¶ 16-18; DC Decl. ¶¶ 8-12; Declaration of Gail Armendinger ("GA Decl.") ¶¶ 4-5.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff received an offer shortly after the last interview, Plaintiff was a well qualified candidate and had a set of skills Defendant needed at the time and agreed to match Plaintiff's rate and contract at AIG (Appendix: E).

Defendant teamed up with NYPD to attack Plaintiff only because Plaintiff is a black man who was successful. They were not able to make Plaintiff's arrest "a bigger deal than it is" and that's the reason why Plaintiff is still alive and a free man today.

7.      Mrs. Crouch's decision was made after multiple telephonic and in-person interviews of Plaintiff.  FA Decl. ¶ 17; DC Decl. ¶¶ 8-10.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff was interviewed by a few people from diverse backgrounds who all voted in favor of Plaintiff to be hired. Plaintiff hiring was not Mrs. Crouch's decision alone.

8.      In response to the New York Fed's offer, SOFT asked the New York Fed for a higher hourly pay rate for Plaintiff's services, because Plaintiff had asked SOFT to pay him a higher hourly rate for the assignment at the New York Fed. DC Decl. ¶ 12; Pl. Dep. 23:10-14.[1] To ensure that Plaintiff's services were engaged, Mrs. Crouch obtained approval to pay SOFT the requested higher rate, and SOFT thereafter accepted the New York Fed's offer on July 3, 2015. DC Decl. ¶¶ 12-13; Pl. Dep. 23:15-17; FA Decl. ¶ 20.

PLAINTIFF RESPONSE: **NOT TRUE**

During the interview process Plaintiff made it clear to Defendant that Plaintiff is interested in a permanent position only and is currently on a contract to hire with AIG. Plaintiff informed Mrs. Crouch as well as Mrs. Robinson and all the interviewers that Plaintiff met that day to make sure that everyone knows Plaintiff wants a permanent position. Mrs. Robinson, Mrs. Devine, Mrs. Crouch as well as SOFT, Inc repeatedly promised Plaintiff that Defendant intended to make the contract turn permanent, told Plaintiff Defendant would match my current contract-to-hire agreement with AIG and match my AIG rate as well. (Appendix: E) which Defendant did and matched Plaintiff's contract and rate at AIG.

That is the only reason why plaintiff rate was increased, it was not to do a favor to Plaintiff as Defendant is falsely insinuating but to match plaintiff's AIG-contract-to-hire. Furthermore, the contract received by Plaintiff made no mentions of the discussion and other agreements reached on the phone (Appendix: U).

6

**B. The Contracts Governing Plaintiff's Work Assignment and Its Six-Month Duration**

9.      The agreement between SOFT and the New York Fed concerning Plaintiff's work assignment is reflected in a Work Order, dated August 28, 2015 (the "Work Order"). FA Decl. ¶ 21; FA Decl Ex. C; DC Decl. ¶ 13.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff has nothing to do with agreements between SOFT Inc and Defendant. Plaintiff receives only one contract from SOFT Inc (Appendix: D) and was never part of contract between SOFT and Defendant. The agreement between SOFT and the New York Fed concerning Plaintiff's work assignment is reflected in Plaintiff's contract received from SOFT Inc (Appendix: D). Which contains strategically vague, irrelevant and misleading information. Allowing Defendant to hide behind consulting companies, as these contractors don't have a direct contract with Defendant therefore and subject to abuses, especially for African American employees as Plaintiff experience first hand.

Additionally, here is an e-mail sent by Mrs. Crouch to announce Plaintiff's joining of the team. As you can see Mrs. Crouch is not mentioning Plaintiff start or end dates. Plaintiff was not getting engaged for a short-term initiative (Appendix: V).

10.     The Work Order was made pursuant to a Master Staffing Agreement between the New York Fed and SOFT, dated March 23, 2015 (the "Master Staffing Agreement"), and, as stated in the Work Order, the terms of the Master Staffing Agreement are incorporated by reference into the Work Order. FA Decl. ¶ 21; FA Decl. Ex. C at 1 (Work Order); FA Decl. Ex. D (Master Staffing Agreement).

PLAINTIFF RESPONSE: **NOT TRUE**

7

Plaintiff has never been part of any agreement, and is not aware of the specifics of any agreements between SOFT and the New York Fed. Plaintiff's agreements with SOFT Inc and Defendant during the hiring process were not kept by Defendant, Plaintiff contact or offer letter did not contain any references to promises Defendant made to Plaintiff during the hiring process. The contract Plaintiff received had no such information and was written in a confusing way as you can see from plaintiff Offer package from SOFT inc, on behalf of Defendant (Appendix: B) as well as the contract SOFT Inc sent Plaintiff (Appendix: D)

11.     Under the Master Staffing Agreement, the New York Fed had the right to terminate the Work Order, and Plaintiff's work assignment under it, "upon notice to [SOFT] given at any time, for any reason or for no reason." FA Decl. ¶ 23; FA Decl. Ex. D ¶ 10.2.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff has never been part of any agreement, and is not aware of the specifics of any agreements between SOFT and the New York Fed. Plaintiff had a contract to hire agreement different than other contractors as it was designed to match or surpass Plaintiff's contract at the time with AIG. Plaintiff's offer letter did not mention these things. (Appendix: D, Appendix: E)

Plaintiff's Offer Letter in Plaintiff Offer Package (Appendix: B) showed no end date or start date or none of the agreements Plaintiff, SOFT Inc and Defendant discussed during the hiring process. Therefore, this is not true.

12.     The Work Order reflects an expected end date of December 29, 2015 for Plaintiff's work assignment. FA Decl. Ex. C at 1; FA Decl. ¶ 22; DC Decl. ¶ 14.

PLAINTIFF RESPONSE: **NOT TRUE**

8

Plaintiff's Offer Letter in Plaintiff Offer Package (Appendix: B) as well as the Offer Letter received from SOFT Inc (Appendix: D) showed no end date or start date or agreements Plaintiff, SOFT Inc and Defendant discussed during the hiring process. (Appendix: U)

During the interview process Plaintiff made it clear to Defendant that Plaintiff is interested in a permanent position only and is currently on a contract to hire with AIG. Plaintiff informed Mrs. Crouch as well as Mrs. Robinson and all the interviewers that Plaintiff met that day to make sure that everyone knows Plaintiff wants a permanent position and is not interested in leaving AIG for a contract. Mrs. Crouch as well as SOFT, Inc repeatedly promised Plaintiff that the contract was going to turn permanent told Plaintiff Defendant would match contract-to-hire and $95/Hr rate with AIG. (Appendix: E) which Defendant did when they agreed to match Plaintiff contract with AIG (Appendix: A).

Furthermore, Defendant claims that Plaintiff contract was ending on December 29th is not true. Defendant own job description describes a long-term contract. (Appendix: F) which Plaintiff managed to have Defendant convert into a contract-to-hire to match Plaintiff AIG contract and rate at the time (Appendix: E).

Plaintiff is not familiar with specifics of any agreements between SOFT and Defendant. Plaintiff's Offer Letter in Plaintiff Offer Package (Appendix: B) showed no end date or start date or none of the agreements Plaintiff, SOFT Inc and Defendant discussed during the interviews.


13.     To align the length of the assignment with the original intent of engaging a contingent worker for six months, on September 16, 2015, Mrs. Crouch extended the duration of Plaintiff's work assignment to January 29, 2016.  DC Decl. ¶ 15; DC Decl. Ex. A; FA Decl. ¶ 22. PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff's Offer Letter in Plaintiff Offer Package (Appendix: B) showed no end date or start date or none of the agreements Plaintiff, SOFT Inc and Defendant discussed during the interviews. Plaintiff does not know why Mrs. Crouch kept updating plaintiff information or why it was not accurate in the first place but it cannot be because of the reason stated by Defendant here because during the interview process Plaintiff made it clear to Defendant that Plaintiff is interested in a permanent position only and is currently on a contract to hire with AIG. Plaintiff informed Mrs. Crouch as well as Mrs. Robinson and all the interviewers that Plaintiff met that day to make sure everyone knows Plaintiff wants a permanent position and is not interested in leaving AIG for a contract. Mrs. Crouch as well as SOFT, Inc repeatedly promised Plaintiff that the contract was going to turn permanent told Plaintiff Defendant would match my contract-to-hire and $95/Hr rate with AIG. (Appendix: E) which Defendant did when they agreed to match Plaintiff's offer and rate at AIG (Appendix: E) (Appendix: A).

14.     On November 30, 2015, Mrs. Crouch extended the period of time that Plaintiff would have access to the New York Fed's computer systems, from December 31, 2015 through the end of January 2016, so that Plaintiff would not lose access before his work assignment ended.  DC Decl. ¶ 16; DC Decl. Ex. B.

PLAINTIFF RESPONSE: **NOT TRUE**


Ms. Crouch was manipulating Plaintiff's information because she knew Plaintiff's 6 months term was near and Plaintiff performed well and passed a security clearance and was about to start fulltime employment discussion with HR.

Plaintiff assignment was not supposed to end in January as asserted by Defendant. Defendant own job description describes a "long tem contract" (Appendix: F) and Defendant

10

agreement to match Plaintiff contract with AIG (Appendix: E) and convert the position into a

contract to hire at a $95/Hr rate.

### C. Plaintiff's Work Assignment from August 5, 2015 Through December 22, 2015

15.    On August 5, 2015, Plaintiff began providing services to the New York Fed in the

role of a Project Manager in the Electronic Payments Project Management Office.  DC Decl. ¶

17

PLAINTIFF RESPONSE: **TRUE**

16.    During the period when Plaintiff provided services to the New York Fed, there

were three other people in the Project Management Office: (i) Mrs. Crouch; (ii) Kumaresan

Krishnasamy, a New York Fed employee who had been with the New York Fed for eight years,

and (iii) Srinivas Naikoti, a contingent worker who is no longer providing services to the New

York Fed.  DC Decl. ¶ 18; GA Decl. ¶ 6.

PLAINTIFF RESPONSE: **NOT TRUE**

In Plaintiff recollection, the Project Management Office was much larger and wider than

Defendant is asserting. Mrs. Crouch had responsibilities that Plaintiff didn't know about and

certain days of the week she was working from another location.

17.    Neither Mr. Krishnasamy nor Mr. Naikoti are Caucasian.  Plaintiff testified that

they are both "Indians" from "India."  Pl. Dep. 38:6-13.

PLAINTIFF RESPONSE: **MISLEADING**

If Plaintiff testified that they are both Indians why bring it up and specify that they are not

Caucasians? If Defendant is not trying to dispute that Plaintiff was the only African on the team.

11

Defendant is maliciously trying to insinuate that Mrs. Crouch didn't have any problems with "Indians" from "India" therefore Plaintiff as an African somehow cannot have a discrimination claim is simply racist and consistent with white supremacist, and is not in line with the law.

African and Indians are two different people that are protected just like all races. Title VII is not a law against Caucasians being racist against non-Caucasians; The Title VII law is about anyone from any race being racist against anyone of any race. Plaintiff mentioned Caucasians in his complaint because the people who attacked Plaintiff were all Jews and Whites. All races are a protected "group", Defendant racism and condescending behavior towards Non-Caucasians is on display here once more.

18.     Plaintiff, Mr. Krishnasamy and Mr. Naikoti, and no one else, reported to Mrs. Crouch during this period.  DC Decl. ¶ 19; GA Decl. ¶ 7.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff was the only person from African descent on the team. In Plaintiff's recollection, the Project Management Office was much larger and wider than Defendant is asserting. Mrs. Crouch had responsibilities that Plaintiff didn't know about and certain days of the week she was working from another location.

19.     Shortly after his work assignment began, Plaintiff participated in training on the New York Fed's Equal Employment Opportunity policy against discrimination on the basis of race, color and national origin, among other protected classes, and was informed of the New York Fed's discrimination complaint procedure.  Pl. Dep 38:25-39:9; MB Decl. Exs. B, C at 29-30.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff didn't participated in actual trainings at the Fed, just documents to read mostly

dealing with security and privacy.

20.     During his work assignment, Plaintiff never raised any discrimination concerns through that procedure.  Pl. Dep. 88:18-19.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff raised discrimination and other issues and was never helped. Appendix: G) Plaintiff was looking to becoming a permanent employee and wanted to be secured in his career, in actuality Plaintiff had nowhere to go to complain about anything or to get any help.

21.     Through December 22, 2015, Plaintiff's work performance was satisfactory.  DC Decl. ¶ 22.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff performances were not just "satisfactory", Plaintiff performances were "GREAT" according to messages of praise received from colleagues and coworkers including people from other branches of the Federal Reserve System (Appendix: C) who congratulated Plaintiff on great performances.

Plaintiff was having great performances and was getting praises and encouragements from coworkers and was looking forward to a great career. Plaintiff provided fresh ideas and suggestions and helped move initiatives that had been stagnating for years.

22.     Mrs. Crouch interacted with Plaintiff on a regular basis, including by providing feedback on work product and engaging in other work-related correspondence.  DC Decl. ¶ 21.

PLAINTIFF RESPONSE: **NOT TRUE**

Mrs. Crouch interactions with Plaintiff were not actually based on work-related correspondence but on calculations that Mrs. Crouch had made about Plaintiff potential career with Defendant. Mrs. Crouch interactions with Plaintiff were all mostly designed to sabotage plaintiff reputation or popularity, as Mrs. Crouch was uncomfortable with a black man displaying leadership.

23.     On September 29, 2015, Mrs. Crouch sent Plaintiff an email telling him that he did a "[n]ice job" on a status report. DC Decl. Ex. C. On October 6, 2015, Mrs. Crouch sent Plaintiff an email stating that he could attend a training because it would "help [him] do [his] job at the New York Fed." *Id.* On December 17, 2015, Mrs. Crouch sent Plaintiff an email granting his request to work from home because he was sick and telling him to "[f]eel better," *Id.*; *see also* DC Decl. ¶ 21.

PLAINTIFF RESPONSE: **MISLEADING**

Defendant is mixing up of bits of unrelated information is misleading.

## D. The Termination of Plaintiff's Work Assignment on December 23, 2015

24.     Federal Reserve Law Enforcement is a police force charged with securing the New York Fed. DH Decl. ¶ 4. The Law Enforcement Unit at the New York Fed had previously been a Protection Department, but became a Federal Reserve Law Enforcement Unit in the wake of September 11, 2001 in provisions included in the USA PATRIOT Act. DH Decl. ¶ 3.

PLAINTIFF RESPONSE: **NOT TRUE**

The Federal Reserve Law Enforcement unit admitted following Plaintiff during his clearance investigation, and refused to help Plaintiff when I called them for help as an individual

14

was following Plaintiff to Church and then came to Plaintiff home the same night to deliver

something Plaintiff never ordered. (Appendix: G).

Furthermore, Police Commissioner Bill Bratton and the NYPD came inside the Federal

Reserve to arrest Plaintiff despite the presence of the Federal Reserve law Enforcement, making

Plaintiff question what they really are? Plaintiff is not sure what The Federal Reserve Law

Enforcement force is supposed to be doing but what Defendant just described is not consistent

with Plaintiff's experience with The Federal Reserve Law Enforcement Unit.


25.     When entering the New York Fed, the Federal Reserve Law Enforcement requires

all non-employee visitors (including contingent workers) to run any bags in their possession

through an x-ray machine at a security checkpoint and pass through a metal detector.  DH Decl. ¶

5.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff does not believe Feds "policies" are applied the same for everyone.


26.     When Plaintiff arrived at the New York Fed on the morning of December 23,

2015 with luggage, prior to running it through an X-ray machine, he informed Federal Reserve

Law Enforcement officers at the checkpoint that he possessed a Taser and pepper spray.  DH

Decl. ¶ 9; Pl. Dep. 42:14-21.

PLAINTIFF RESPONSE: **NOT TRUE**

When Plaintiff arrived Plaintiff explained he is traveling and inside Plaintiff luggage

there is a small Taser and a little "key-chain pepper spray" that Plaintiff bought on eBay a few

days prior and Federal Reserve Law Enforcement said it was not permitted and Plaintiff will

need to give it to them. Plaintiff apologized and returned the safety equipment and explained he

was traveling etc and Federal Reserve Law Enforcement officers told Plaintiff it was "no big

deal" as described in Plaintiff's 5th Amended complaint.

Furthermore, as you can see from an extract of "New York State Penal Code § 265.01"

below, the law says "with intent to use the same unlawfully against another;" meaning Plaintiff

mere possession of these safety equipment can be considered a crime or be unlawful only if

Plaintiff had intention to use these equipment.

"New York State Penal Code § 265.01 Criminal possession of a weapon in the fourth degree. A person is guilty of

criminal possession of a weapon in the fourth degree when:   (1) He possesses any firearm, electronic dart gun, electronic

stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal  knuckle knife, cane sword, billy, blackjack,

bludgeon, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung

Fu star"; or   (2) He possesses any dagger, dangerous knife, dirk, razor, stiletto,  imitation pistol, or any other dangerous or

deadly instrument or weapon  with intent to use the same unlawfully against another;"

This interpretation is consistent with a 2/22/16 decision by a New York State Court to

dismiss Defendant claims as "Legally Insufficient" and Plaintiff was completely exonerated.

(Appendix: H). Yet, Defendant continues to make this false claim as if the law doesn't matter

and continues to call Plaintiff's actions unlawful and went as far as classifying Plaintiff as a

"Risk going forward" for the Federal Reserve. All for a "Legally Insufficient" reason and

escalated simply because Plaintiff is a Black man.

Additionally, on 12/18/2012 Mr. Elliot A. Ray attempted to enter Defendant's building
with a Smith and Wesson .38 gun with 6 rounds of ammunitions. Mr. Elliot A. Ray, a white man,
was not arrested by the NYPD or Police Commissioner Bill Bratton (Appendix: W) and Mr.
Elliot was not classified as a "risk going forward" even if he was carrying an actual weapon with
ammunitions. Simply because Mr. Elliot is white, defendant gave him the "white supremacy"
treatment.

In comparison, for a "Legally Insufficient" incident created by Plaintiff, Defendant went
out of their way to kill or destroy Plaintiff's life. Plaintiff had to face a judge, loose his job, be
insulted in e-mails by Mr. Hurley's colleague Mr. Baxter Thomas, be harassed and beaten by the

16

police, retaliated against and classified as a risk (Appendix: S) (Appendix: R) simply because I'm a Black man and solely based on race.

Defendant cannot explain how they lost 9 Trillions and sent this money to create a New World Order where certain people (black people) have to be harassed until they abandon their own life or die while white people can get all benefits in life and society. **Defendant, The owners of the Federal Reserve System are a MONSTROUS JEWISH ORGANIZATION that is trying to own freedom and enslave the American people with infinite debt.**

27. Plaintiff was told by the Federal Reserve Law Enforcement officers that the Taser was illegal in New York State and both it and the pepper spray were confiscated. Pl. Dep. 47:20-48:2.

PLAINTIFF RESPONSE: **NOT TRUE**

The Federal Reserve Law Enforcement officers also told Plaintiff it was "no big deal" but more importantly no crime were committed contrary to what Defendant is suggesting as a New York State Court (Appendix: H) concluded that Plaintiff possession of a Taser and Pepper spray was "Legally Insufficient". Therefore Plaintiff committed no crime, and this is a fact that Defendant is always carefully ignoring to mention.

When Plaintiff arrived in the morning, Plaintiff explained that he is traveling and inside Plaintiff luggage there is a small Taser and a little "key-chain pepper spray" that Plaintiff bought on eBay a few days prior and Federal Reserve Law Enforcement said it was not permitted, Plaintiff apologized and returned the safety equipment, explaining that he was traveling etc and Federal Reserve Law Enforcement officers told Plaintiff it was "no big deal" as described in Plaintiff's 5th Amended complaint.

Furthermore, as you can see from an extract of "New York State Penal Code § 265.01" below, the law says "with intent to use the same unlawfully against another;" meaning Plaintiff mere possession of these safety equipment cannot be considered a crime or be unlawful since

17

Plaintiff no had intention to use these equipment, and Defendant is not denying it.

"New York State Penal Code § 265.01 Criminal possession of a weapon in the fourth degree. A person is guilty of criminal possession of a weapon in the fourth degree when:   (1) He possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star"; or   (2) He possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon <u>with intent to use the same unlawfully against another;</u> "

This interpretation is consistent with the 2/22 decision by a New York State Court to dismiss Defendant claims as "Legally Insufficient" and Plaintiff was completely exonerated. (Appendix: H). Yet, Defendant continues to make the claim that Plaintiff committed a crime as if the law doesn't matter. Defendant continues to call Plaintiff's actions unlawful and went as far as classifying Plaintiff as a "risk" for the Federal Reserve going forward.

Additionally, considering the list of potential "things" that are classified exactly the same as the safety equipment Plaintiff was carrying, Defendant cannot claim that in more than one hundred years nobody ever walked into the Federal Reserve with any of these things is simply not possible. Especially when Federal Reserve own Law Enforcement told plaintiff it was "no big deal" as shown on Defendant surveillance camera (Appendix: I) where we can clearly see Federal Reserve Law Enforcement officer discuss with Plaintiff as if nothing major was happening and then we can see them being very quiet and confused when they realized Plaintiff was getting arrested.


28.     The Federal Reserve Law Enforcement officers then summoned Delayne Hurley, the Law Enforcement Unit's Director of Uniform Operations, who had never before interacted with either Mrs. Crouch or Plaintiff.  DH Decl ¶¶ 8-9.  Plaintiff confirmed to Mr. Hurley that he had possessed the confiscated items.  DH Decl. ¶ 10.

18

PLAINTIFF RESPONSE: **NOT TRUE**

First, Plaintiff does not believe it is true that Mrs. Crouch never interacted with Law Enforcement officer Hurley before in the 33 years she worked there.

Secondly, Plaintiff remembers speaking with almost all the officers involved including the NYPD officers. Plaintiff remembers most notably speaking to Police Commissioner Bill Bratton who came out of a room with Plaintiff Driver License after Plaintiff gave it to the Federal Reserve Law Enforcement (Fed Police) and started yelling at Plaintiff. During discovery Defendant sent Plaintiff series of not only extremely low quality images but also ill-selected video surveillance footages that were all edited to remove Mr. Bratton's intervention. (Appendix: I) Reinforcing Plaintiff determination to demonstrate Defendant targeted plaintiff and purposefully attempted to destroy Plaintiff's life or maybe even kill Plaintiff just because Plaintiff is a black man who was popular/successful in an environment where Defendant does not want Black people to have visible success/contributions or leadership. Defendant is now hiding this by trying to conceal the appearance of Commissioner Bratton who was there as Defendant's executioner.

Additionally, Defendant has arrested Mr. Elliot A. Ray in 2012 with a loaded gun inside of Defendant's building but was never arrested by the NYPD or the police commissioner as Plaintiff was even if he was carrying a loaded Gun and 6 rounds of ammunitions (Appendix: W) and Plaintiff was carrying no such weapons but still got arrested. Simply because Plaintiff is a Black man he was also classified as a "risk" for Defendant contrary to Mr. Elliot A. Ray, who as a white man received a better treatment from Defendant despite the fact that he was carrying a loaded Gun and Plaintiff didn't have any actual weapons on him.

A NY State court dismissed Defendant accusations as Legally Insufficient (Appendix: H)

19

A white man they didn't know entered with a gun and they just retained him for a short period of time but Plaintiff who didn't have a gun or ammunition had to see his life go down the drain.

29.   Federal Reserve Law Enforcement's practice is to contact the NYPD when it believes a crime has been committed under New York State law.  DH Decl. ¶¶ 6-7.  Consistent with that practice, Mr. Hurley instructed a Federal Reserve Law Enforcement officer to inform the NYPD of the situation.  DH Decl. ¶ 12.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff did not commit any crime as concluded by New York State Court on 2/22 (Appendix: H). Plaintiff had no intention of using the key-chain pepper spray or the Taser and defendant does not deny it. When you consider these two facts, it becomes clear that Defendant manufactured this whole situation with the NYPD and Commissioner Bratton to kill Plaintiff through Police brutality or make Plaintiff guilty of a "manufactured" crime to burry Plaintiff in the prison system.

A white NYPD officer Evan Melle or Officer Max Outsen told Plaintiff that the Defendant was calling them (the 7th district) to make it a "bigger deal than it is" and ask Police to keep Plaintiff in confinement so that Defendant can take their time to come meet Plaintiff in jail.

Furthermore, as you can see from an extract of "New York State Penal Code § 265.01" below, the law says "with intent to use the same unlawfully against another;" meaning Plaintiff mere possession of these safety equipment is a crime or be unlawful only if Plaintiff had intention to use these equipment. Which Plaintiff didn't, as Defendant does not dispute.

"New York State Penal Code § 265.01 Criminal possession of a weapon in the fourth degree.  A person  is  guilty of criminal possession of a weapon in the fourth  degree when:   (1) He possesses any firearm, electronic  dart gun, electronic stun  gun,  gravity knife, switchblade knife, pilum ballistic knife, metal  knuckle knife, cane sword, billy, blackjack,

bludgeon, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star"; or    (2) He possesses any dagger, dangerous knife, dirk, razor, stiletto,  imitation pistol, or any other dangerous or deadly instrument or weapon <u>with intent to use the same unlawfully against another;</u> "

This is consistent with the 2/22 decisions by a New York State Court to dismiss Defendant claims as "Legally Insufficient" and Plaintiff was completely exonerated. (Appendix: H). Yet, Defendant continues to make the claim that Plaintiff committed a crime as if the law doesn't matter. Defendant continues to call Plaintiff's actions unlawful and went as far as classifying Plaintiff as a "Risk for the Federal Reserve going forward" only because Plaintiff is a black man.

Additionally, considering the list of potential things that are classified exactly the same as the safety equipment Plaintiff was carrying, Defendant cannot claim that in more than one hundred years nobody ever walked into the Federal Reserve with any of these things is simply not possible. Especially when Federal Reserve own Law Enforcement told plaintiff it was "no big deal" as shown on Defendant surveillance camera. (Appendix: I) where we can clearly see Federal Reserve Law Enforcement officer discuss with Plaintiff as if nothing major was happening and then we can see them being very quiet and confused when they realized Plaintiff was getting arrested.

Mr. Hurley claims that it's a "practice" to involve NYPD in incident at the Bank is also not true. Defendant arrested Mr. Elliot A. Ray in 2012 with a loaded gun inside of Defendant's building but was never arrested by the NYPD or the Police Commissioner Bratton as Plaintiff was arrested. Mr. Elliot was carrying a loaded Gun and 6 rounds of ammunitions (Appendix: W) and Plaintiff was carrying no such weapons but still got arrested. Simply because Plaintiff is a Black man he was also classified as a "risk" for Defendant contrary to Mr. Elliot A. Ray, who as a white man received a better treatment from Defendant despite the fact that he was carrying a

loaded Gun with 6 rounds of ammunitions and Plaintiff didn't have any actual weapons on him. Furthermore, a NY State court classified Defendant accusations as Legally Insufficient. (Appendix: H) but Defendant continues to claim Plaintiff committed a crime. Simply because plaintiff is a black man Defendant blew Plaintiff acts out of proportion but when faced with a white man in a similar situation and actual weapons, Defendant did nothing. (Appendix: W)

30.    Shortly thereafter, two NYPD officers arrived, took custody of the Taser and pepper spray, placed Plaintiff under arrest, and escorted him out of the New York Fed. DH Decl. ¶ 13.

PLAINTIFF RESPONSE: **NOT TRUE**

Federal Reserve law Enforcement unit kept the Taser and pepper spray. Furthermore, as you can see from an extract of "New York State Penal Code § 265.01" below, the law says "with intent to use the same unlawfully against another;" meaning Plaintiff mere possession of these safety equipment can be considered a crime or be unlawful only if Plaintiff had intention to use these equipment.

"New York State Penal Code § 265.01 Criminal possession of a weapon in the fourth degree. A person is guilty of criminal possession of a weapon in the fourth  degree when:    (1) He possesses any firearm, electronic dart gun, electronic stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot or slungshot, shirken or "Kung Fu star"; or    (2) He possesses any dagger, dangerous knife, dirk, razor, stiletto, imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another; "

This interpretation is consistent with the 2/22 decision by a New York State Court to dismiss Defendant claims as "Legally Insufficient" and Plaintiff was completely exonerated. (Appendix: H). Yet, Defendant continues to make the claim that Plaintiff committed a crime as if the law doesn't matter. Defendant continues to call Plaintiff's actions unlawful and went as far as

classifying Plaintiff as a "risk" for the Federal Reserve going forward.

Additionally, considering the list of potential things that are classified exactly the same as the safety equipment Plaintiff was carrying, Defendant cannot claim that in more than one hundred years nobody ever walked into the Federal Reserve with any of these things. This is simply not possible for this private bank. Especially when Federal Reserve own Law Enforcement told plaintiff it was "no big deal" as shown on Defendant surveillance video (Appendix: I) which shows Federal Reserve Law Enforcement officer discussing with Plaintiff as if it was "no big deal" and then the video show the same Federal Reserve Law Enforcement officer being stunned but quiet when they realized Plaintiff was getting arrested.

Mr. Hurley claims that it's a "practice" to involve NYPD in incident at the Bank is also not true. Defendant arrested Mr. Elliot A. Ray in 2012 with a loaded gun inside of Defendant's building but was never arrested by the NYPD or the Police Commissioner Bratton as Plaintiff was arrested. Mr. Elliot was carrying a loaded Gun and 6 rounds of ammunitions (Appendix: W) and Plaintiff was carrying no such weapons but still got arrested. Simply because Plaintiff is a Black man he was also classified as a "risk" for Defendant contrary to Mr. Elliot A. Ray, who as a white man received a better treatment from Defendant despite the fact that he was carrying a loaded Gun with 6 rounds of ammunitions and Plaintiff didn't have any actual weapons on him. Furthermore, a NY State court classified Defendant accusations as Legally Insufficient. (Appendix: H) but Defendant continues to claim Plaintiff committed a crime. Simply because plaintiff is a black man Defendant blew Plaintiff acts out of proportion but when faced with a white man in a similar situation and actual weapons, Defendant did nothing. (Appendix: W)

31.     Other than Plaintiff, Mr. Hurley has never encountered any New York Fed

employee or contingent worker in possession of a weapon on New York Fed premises that is illegal to possess in New York State.  DH Decl. ¶ 21.

PLAINTIFF RESPONSE: **NOT TRUE**

Defendant's arrested Mr. Elliot A. Ray inside the bank in 12/8/2012 and as described in #30 demonstrating Mr. Hurley's hypocrisies once more. Defendant cannot make it's own laws. As you can see from an extract of "New York State Penal Code § 265.01" below, the law says "with intent to use the same unlawfully against another;" meaning Plaintiff mere possession of these safety equipment can be considered a crime or be unlawful only if Plaintiff had intention to use these equipment against Defendant and their guns which Defendant does not argue as Plaintiff walked in and told the officer that he had these items in his luggage.

"New York State Penal Code § 265.01 Criminal possession of a weapon in the fourth degree.  A person is guilty of criminal possession of a weapon in the fourth  degree when:   (1) He possesses any firearm, electronic dart gun, electronic stun  gun,  gravity knife, switchblade knife, pilum ballistic knife, metal  knuckle knife, cane sword, billy, blackjack, bludgeon, metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type slingshot  or slungshot, shirken or "Kung Fu star"; or   (2) He possesses any dagger, dangerous knife, dirk, razor, stiletto,  imitation pistol, or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another; "

New York State Court 2/22 decision to dismiss Defendant accusations as "Legally Insufficient" is very consistent with the law. Plaintiff was completely exonerated. (Appendix: H). Yet, Defendant continues to make the claim that Plaintiff committed a crime as if the law doesn't matter. Defendant continues to call Plaintiff's actions unlawful and went as far as classifying Plaintiff a "risk" for the Federal Reserve going forward indicating Defendant intent to continue his persecution of Plaintiff for the rest of Plaintiff's life.

Additionally, considering the list of potential things that can be classified exactly the same as the safety equipment Plaintiff was carrying, Defendant cannot claim that in more than one hundred years of existence nobody ever walked into the Federal Reserve with any of these

24

things in their possession. This is simply not possible for such a gigantic private bank. Plaintiff

was arrested simply because Plaintiff was targeted as a black man, Defendant attempted to

manufacture a "bigger crime" as described by NYPD officer Evan Mele or his colleague Max

Outsen after the fact. Federal Reserve own Law Enforcement told plaintiff it was "no big deal"

as shown on Defendant surveillance video (Appendix: I) that show Federal Reserve Law

Enforcement officer discussing with Plaintiff as if it was "no big deal" and then the video shows

the same Federal Reserve Law Enforcement officers stunned to see Plaintiff get arrested by

external NYPD police officers.


32.     After the arrest, Mr. Hurley called Mrs. Crouch and informed her of the foregoing

events, and told her that he considered Mr. Nguedi to be a risk to the New York Fed going

forward.  DH Decl. ¶¶ 14-15; DC Decl. ¶¶ 23-24.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff was not there and Federal Reserve law Enforcement officers told plaintiff it was

no big deal which indicated to Plaintiff in that Defendant's 100+ years of existence someone has

entered there before with a Swiss or pocket knife before etc and was not arrested. Defendant is

trying to make it a bigger deal than it is in Plaintiff's case because they have an agenda against

young black males. Plaintiff had no intention of using the key-chain pepper spray or the Taser

and defendant does not deny it. Furthermore, no crime was committed as decided by a New York

State Court on 2/22 (Appendix: H). Defendant had this type of events before, this is the first time

Defendant arrested anyone for such an incident but they decided to arrest Plaintiff. This is not

because Defendant was afraid of Plaintiff key-chain pepper spray to the point they classified

Plaintiff as a "Risk" and called the police Commissioner.

Is the Central bank supposed to target innocent citizen for non-banking related issues? Defendant just admitted of violating his authority as well as Plaintiff's civil rights.

33.      Mr. Hurley's determination was based on the fact that Plaintiff illegally possessed a Taser on New York Fed premises, Plaintiff's demeanor during Mr. Hurley's face-to-face interaction with him, and the fact that Plaintiff was a non-employee contingent worker who did not have a direct or lengthy relationship with the New York Fed.  DH Decl. ¶ 16.

PLAINTIFF RESPONSE: **NOT TRUE**

The central bank of the United State is now admitting targeting innocent citizen and classifying them us as "risk" for bogus reasons and based on bogus classification that in fact are hiding a hate-fueled and institutionalized racism aims, in close collaboration with the Police.

As shown by Defendant own video surveillance, Plaintiff did not have any issue during any face-to-face conversation with any of the officers (Appendix: I). **The only officer Plaintiff had an issue with was Police Commissioner Bill Bratton who yelled at plaintiff about guns and knives when Plaintiff wasn't even in possession of any of these weapons.**

Furthermore, it is not true that Plaintiff did not have a direct or lengthy relationship with the New York Fed. During the interview process Plaintiff made it clear to Defendant that Plaintiff is interested in a permanent position only and is currently on a contract to hire with AIG. Plaintiff informed Mrs. Crouch as well as Ms. Robinson and all the interviewers that Plaintiff met that day to make sure that everyone knows Plaintiff wants a permanent position and is not interested in leaving AIG contract. Mrs. Crouch as well as SOFT, Inc repeatedly promised Plaintiff that the contract was going to turn permanent told Plaintiff Defendant would match my current contract-to-hire, and match my the rate (Appendix: E) which Defendant did when they

26

agreed to match my offer at AIG as well as my $95/Hr. rate at AIG.

Furthermore, going back to the December 23rd events, Defendant own Federal Reserve law Enforcement officers told plaintiff it was not big deal which indicated to Plaintiff in that Defendant's 100+ years of existence someone has entered there before with a Swiss or pocket knife before etc and was not arrested. Defendant is trying to make it a bigger deal than it is in Plaintiff's case because they have an agenda to kill talented black people. Plaintiff had no intention of using the key-chain pepper spray or the Taser and defendant does not deny it but yet Defendant is still obsessed with calling Plaintiff actions a crime when a New York State Court decided on 2/22 (Appendix: H) that it was legally insufficient. Defendant had this type of events before, this is only the first time they decide to arrest someone and it's not because Defendant was so afraid of Plaintiff key-chain pepper spray to the point they classified Plaintiff as a "Risk" and called the police Commissioner. Plaintiff is now curious to know whom else is a risk to Defendant and what did they do to deserve that classification? What other bogus classifications like that they have on people and what are they doing to these people? And who is determining if what they do to the people they classify as "risk" or anything else is consistent with the United States Constitution?

34.     Based on Mr. Hurley's risk determination and understanding that Plaintiff was a non-employee, Mr. Hurley stated he recommended that Plaintiff's work assignment be terminated.  DH Decl. ¶ 17; DC Decl. ¶ 24.

PLAINTIFF RESPONSE: **NOT TRUE** .

Plaintiff does not know who Mr. Hurley is and on which logical basis he would be given authority to terminate Plaintiff without even talking to Plaintiff's manager. Defendant is making

up these stories to hide lies they told to current employees about Plaintiff's termination as you can see from these e-mails from same Mr. Hurley and Mrs. Crouch lying to employees about Plaintiff's termination. (Appendix: J) Mr. Hurley told multiple lies about why Plaintiff was arrested saying Plaintiff was carrying a "bag" which sounds more suspicious than a regular luggage, adding Plaintiff had a mace which is a lie, and then letting one of his coworkers call Plaintiff a "knucklehead" while telling an inaccurate account of Plaintiff explanation.

A key-chain pepper-spray and Taser in Plaintiff's luggage is not a risk to the Federal Reserve, specifically from someone with a security clearance with no history, someone they know as Plaintiff was working for them and announced myself. Furthermore, a NY state court dismissed it as legally insufficient (Appendix: H) and no crime was committed. Therefore, Defendant assertions are not true.

The New York State Penal Code § 265.01 says possession of certain items can be considered a Weapon only if the perpetrator "had intent to use the same unlawfully against another;" meaning Plaintiff mere possession of these safety equipment is not a crime. Plaintiff had no intention to use these equipment against Defendant AR-15 guns.

Additionally, considering the list of potential things that can be classified exactly the same as the safety equipment Plaintiff was carrying in his luggage on December 23rd 2015, Defendant's claim that in more than one hundred years of existence nobody ever walked into the Federal Reserve with any of these items in their possession is simply detached from the possible, as this is extremely unrealistic for such a gigantic private bank.

Federal Reserve own Law Enforcement told plaintiff it was "no big deal" as shown on Defendant surveillance video. (Appendix: I) that show Federal Reserve Law Enforcement officer discussing with Plaintiff as if it was "no big deal" and then the video shows the same Federal

Reserve Law Enforcement officers stunned to see Plaintiff get arrested.

35.     Other than Plaintiff, no one who reported to Mrs. Crouch has ever possessed a weapon of any kind on New York Fed premises or has been deemed a risk by Federal Reserve Law Enforcement.  DC Decl. ¶ 25.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff was not there during the 33 plus years Mrs. Crouch has been working for Defendant to attest of such a statement and Plaintiff was deemed a risk by Defendant only because Plaintiff is a Black man. Additionally, Plaintiff saw many people with all sorts of weapons inside the Defendant facilities and has no ways of tracking how all these weapons got in there, every day of the week 24 hours a day but yet Plaintiff's little key-chain pepper spray some how makes Plaintiff a "Risk".

Triggering the same questions again, there are plenty of weapons and guns at the Federal Reserve, so Defendant cannot argue nobody ever got in there with a key chain knife or key chain tool similar to what Plaintiff had in his luggage.

Who else is Defendant classifying as "risk" and risk of what exactly? What tangible risk Defendant saw in Plaintiff? Plaintiff is classified as a risk only because Plaintiff is a black man. What other bogus classifications like that Defendant applies on black people? How many? And what are they doing to these people? And who is determining if what they do to the people they classify as "risk" or anything else they can come up with, is consistent with the United States Constitution? Defendant believes it has life and death rights on citizens as they can use the police to execute innocent citizen simply because of their race, as plaintiff experienced first hand.

Plaintiff mere possession of these safety equipment is not a crime and Plaintiff should

have never been arrested as Plaintiff had no intention to use these equipment against Defendant.

36.     Mrs. Crouch relayed the information she learned from Mr. Hurley to her superior,

Gail Armendinger, and they and they agreed to defer to Mr. Hurley's recommendation, given his

knowledge and experience in law enforcement.  DC Decl. ¶ 26; GA Decl. ¶¶ 9-10.

PLAINTIFF RESPONSE: **NOT TRUE**

Mrs. Crouch and her supervisor are lying, as there is no law enforcement experience and

knowledge needed when no laws were broken as Plaintiff didn't break any laws and was

exonerated by a New York Court (Appendix: H). Defendant continues to make up made-up

statements after made-up statements to support assertions that are not true.

Mrs. Crouch was informed of the situation immediately that morning and even had time

to speak with Dallin T. Swenson from SOFT Ink who told Plaintiff that morning that he was

talking with Mrs. Crouch about the incident and that Plaintiff should go home and wait as he is

in discussion with Mrs. Crouch. Mr. Swenson confirmed Plaintiff's termination at 3PM

(Appendix: K).

37.     After speaking with Mrs. Crouch, Mr. Hurley called Mr. Alburquerque and

requested that he commence the off-boarding process for Plaintiff.  DH Decl. ¶ 18; FA Decl. ¶¶

24-25.  The Contingent Workforce Office thereafter communicated to SOFT the New York

Fed's decision to terminate the Work Order, thus ending Plaintiff's assignment. FA Decl. ¶ 26.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff was not there and Plaintiff does not believe that Mrs. Crouch was informed after

the fact as Dallin T. Swenson SOFT Ink told Plaintiff that he was talking with Mrs. Crouch about

the incident around 11AM and confirmed Plaintiff's termination at 3PM. (Appendix: K)

30

38.     Mrs. Crouch called Mr. Alburquerque to discuss the matter and was told that he had already begun the off-boarding process for Plaintiff after receiving a phone call from Federal Reserve Law Enforcement. DC Decl. ¶ 27; FA Decl. ¶ 27.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff was not there and Plaintiff does not believe that Mrs. Crouch was informed after the fact as Dallin T. Swenson SOFT Ink told Plaintiff that he was talking with Mrs. Crouch about the incident around 11AM and confirmed Plaintiff's termination at 3PM. (Appendix: K)

### E.    Plaintiff's Testimony in this Action

39.     Plaintiff testified that he is unaware of any other New York Fed contingent worker or employee who possessed an illegal weapon on New York Fed premises.  Pl. Dep. 46:12-47:9.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff has no means of knowing what is going on inside the Federal Reserve so this statement cannot be true as nobody knows what is going on there.

40.     Plaintiff testified that on December 23, 2015 an unnamed Federal Reserve Law Enforcement officer told him that his possession of the Taser "was no big deal and that stuff like that, it had happened before and nobody was arrested," Pl. Dep. 46:18-21, but no witness or document suggests that any other such incident in fact occurred.

PLAINTIFF RESPONSE: **NOT TRUE**

31

First defendant refused to provide Plaintiff with the name and photo of the law

enforcement officers that were present that day so Plaintiff can identify them so they can come

forward to say what they saw that day. Secondly, defendant own video surveillances show

Plaintiff talking and chatting with Law Enforcement without being arrested. Indicating that this

was no big deal otherwise the federal reserve police would have proceeded to arresting Plaintiff

which is not the case as it's visible on Defendant own Video surveillance.  (Appendix: I)


41.     Plaintiff testified that he believes his termination was due to his arrest by the

NYPD and he is currently litigating a separate lawsuit against the City of New York in which

one of his claims is that the NYPD "made [him] lose his job." Pl. Dep. 144:21-145:2; *see also*

Pl. Dep. 137:14-19 (confirming that his work assignment was terminated "because of the NYPD

and Police Commissioner Bratton").

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff filed a lawsuit against Defendant before filing the lawsuit against the City Of

New York. Secondly, Plaintiff lawsuit against the NYPD is a police Brutality case where the

NYPD broke into Plaintiff's home to kill plaintiff (Appendix: S) and injected drugs to Plaintiff,

which has nothing to do with Plaintiff racial discrimination case against Defendant.

Plaintiff mentioned this case just to indicate that the NYPD has been harassing Plaintiff

in all areas of Plaintiff's life, at work, in Plaintiff's neighborhood, when Plaintiff is grocery

shopping, and inside Plaintiff's own home on Marsh 1st, 2016. (Appendix: R)

42.     Plaintiff testified that he is unaware of "anything that would prevent the New York Fed from being able to terminate [his] work assignment [for] possessing a Taser or pepper spray [on] New York Fed premises." Pl. Dep. 58:2-6.

PLAINTIFF RESPONSE: **NOT TRUE**

Defendant had no reasons to arrest Plaintiff. Plaintiff committed no crime as decided by New York State Court (Appendix: H). Defendant could not fire Plaintiff because Plaintiff was doing a good job and defendant would have to explain firing Plaintiff to everyone because it would have made no sense to the team and everyone would have seen it's just racism.

That is why Defendant chose to try to trick Plaintiff with Commissioner Bratton and kill or destroy plaintiff life by claiming plaintiff is a "risk" or a dangerous criminal who made a mistake and had to be taken out when in fact Plaintiff did nothing (Appendix: H) Plaintiff is just a technology guy who was chowing potential in an environment where black people, especially black males, are oppressed and not allowed to have success or leadership.


43.     Plaintiff testified that Mrs. Crouch yelled at him "every day" of his work assignment in front of "everyone" on the floor," Pl. Dep. 71:13-72:11, but he testified that he could recall only a single interaction because he did not "pay attention" or otherwise could not "remember" any other incidents, Pl. Dep. 78:20-79:6.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff can remember many instances when Mrs. Crouch was yelling at Plaintiff for no reasons. Plaintiff did not bother keeping a record of each time it was happening but it was happening virtually everyday.

33

44.     With respect to the single purported instance that Plaintiff does recall, Plaintiff

testified that it involved Mrs. Crouch asking him to complete a work-related task that he felt he

was "not in a position to do or to do better than [Mrs. Crouch]." Pl. Dep. 78:2-9; Pl. Dep. 73:4-

74:8.

PLAINTIFF RESPONSE: **NOT TRUE**

There was no work related task Plaintiff was not in position to do very well. These were not

work related tasks or related to anything for that matter. Mrs. Crouch would just ask Plaintiff a

question about something I would give her my best answer and she would start claiming there is

something wrong with what Plaintiff said and it would usually turn into Mrs. Crouch screaming

on Plaintiff's face loudly for other people around to believe Plaintiff is incompetent.


45.     Plaintiff testified that on one occasion Mrs. Crouch told him to "show less

leadership" at certain work meetings. Pl. Dep. 74:13-16.  Plaintiff could not recall any context

for this statement, such as when it was made or what else was said during the interaction, other

than asking for clarification from Mrs. Crouch and not receiving any.  Pl. Dep. 75:23-76:6.

Plaintiff testified that he "understood" this statement to mean that "as a black person, you don't

. . . speak[] in  a room full of white people with leadership," but Mrs. Crouch never actually said

that.  Pl. Dep. 76.7-77:8.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff can recall the context very clearly, it took place in Mrs. Crouch's office as explained by

Plaintiff multiple times. Mrs. Crouch actually meant these things and treated Plaintiff that way,

which is even worst in the eyes of Plaintiff.

46.     Plaintiff testified that Mrs. Crouch "laugh[ed]" at the photograph on his New

York Fed identification badge, but also that other people "smil[ed]" when they saw the picture.

Pl. Dep. 67:16-21.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff approached Mrs. Crouch about the issue with the woman in the badge office and

the picture and she pretended that she cannot help me resolve that issue and started showing the

picture on the badge to people around the table laughing at Plaintiff and inviting other people in

the room to laugh at plaintiff. Mrs. Crouch just had a phone call to give to resolve this issue but

she chose to humiliate Plaintiff.

During Discovery, Defendant refused to provide Plaintiff with the actual picture that was

on plaintiff's badge, Defendant claims that Appendix: T was used on Plaintiff badge when

Plaintiff is 100% certain that the picture is not the same. Defendant also, removed Police

Commissioner Bratton's appearance from the surveillance video, Defendant edited surveillance

video to hide the fact that Commissioner Bratton was there.


47.     Plaintiff testified that Mrs. Crouch did not "change" the identification badge

picture for him when he asked.  Pl. Dep. 68:6-11, but Plaintiff could not identify anyone else

who reported to Mrs. Crouch who had received assistance from her in getting a photograph

retaken or who had received assistance from her in any respect.  Pl. Dep. 68:16-71:4.

PLAINTIFF RESPONSE: **NOT TRUE**

Plaintiff does not know how many people have reported to Mrs. Crouch in her 33 years

working for Defendant. Furthermore, making a phone call to the badge office is certainly

something Mrs. Crouch has done in her 33 years working for Defendant. Therefore, she has done

that in the past and the fact that she claims Plaintiff never complained is a pure and simple lie.

Mrs. Donna Crouch is claiming that in her 33 years working for Defendant yet she never

had to help an employee find the badging office or retake a picture is once more another

demonstration of the limitless hypocrisy Defendant is paddling.


48.   Plaintiff testified that he was monitored by three police officers at the New York

Fed "from day one." Pl. Dep. 94:4-15.  That belief is based on Plaintiff's assumptions and

speculation. Pl. Dep. 94:17-96:23.  Plaintiff testified that he did not know who supposedly

positioned those officers around his work area. Pl. Dep. 96:24-97:3.

PLAINTIFF RESPONSE: **NOT TRUE**

Mrs. Crouch clearly identified these individuals in her affidavit at point number #28 even

if she claims these people were either part of "Electronic Payments" or "The Technology Group"

but Mrs. Crouch was not sure who they were, they were never part of any meeting or involved in

anything with Plaintiff and apparently with Mrs. Crouch despite her 33 years working for

defendant, she also pretends she doesn't know who they were. These three men were not part of

any technology group, IT people don't have guns as Plaintiff observed and they were sitting in

cubicle that carried other people's names, and nobody seem to know who they were and why

Plaintiff had to be watched by them.

Today we know Mrs. Crouch saw these three men sitting around Plaintiff and she herself

does not know exactly who they are who they work for and what they were doing there

surrounding Plaintiff while not visibly working on anything other than watching and spying

36

Plaintiff, and treating Plaintiff as a risk or dangerous person simply because Plaintiff is a black man.

49.     No Federal Reserve Law Enforcement officers, or any other law enforcement officers, were ever positioned or stationed in the vicinity of Plaintiff's work area at the New York Fed. DH Decl. ¶ 27; DC Decl. ¶ 28.

PLAINTIFF RESPONSE: **NOT TRUE**

Mrs. Crouch clearly identified these individuals in her affidavit at point number #28 even if she claims these people were either part of "Electronic Payments" or "The Technology Group" but Mrs. Crouch was not sure who they were, they were never part of any meeting or involved in anything if Mrs. Crouch don't know who they are its probably because they were not part of the team and were sitting in cubicles that carried other people's names just to watch Plaintiff all day, just because Plaintiff is a black man.

Mrs. Crouch <u>finally admitted</u> the existence of these three men sitting around Plaintiff and she herself, and despite her 33 years working for the bank, she does not know exactly who these men were who exactly they work for and what they were doing there surrounding Plaintiff while not visibly working on anything other than watching and spying Plaintiff who Defendant has now also classified as a "risk" (Appendix: L) (Appendix: M)

Dated: June 30, 2018
Woodbridge, VA

Respectfully submitted,

Gerard Nguedi
1740 Featherstone Rd
Woodbridge, VA 22191

37



Express

earthsmart

FedEx carbon-neutral
envelope shipping



RECEIVED
JUL - 9 2018
GREGORY H. WOODS
U.S. DISTRICT JUDGE
S.D.N.Y.

USM P3
SDNY

ORIGIN ID:NDVA   (616) 744-7802
GERARD NGUEDI

1740 FEATHERSTONE RDQ

WOODBRIDGE, VA 22191
UNITED STATES US

SHIP DATE: 06JUL18
ACTWGT: 0.60 LB
CAD: 6992005/SSF01904

BILL CREDIT CARD

TO HONORABLE GREGORY H WOODS
UNITED STATES DISTRICT CT
SOUTHERN DISTRICT OF NEW YORK
500 PEARL ST
NEW YORK NY 10007
(000) 000-0000         REF:
INV:
PO:                          DEPT:



FedEx
Express

E

TRK# 7817 3879 3274
[0201]

MON - 09 JUL 3:00P
STANDARD OVERNIGHT

SB PCTA

10007
NY-US EWR