```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/7/2019
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                        :
GERARD NGUEDI,                                          :
                                                        :
                                      Plaintiff,        :          1:16-cv-636-GHW
                                                        :
               -against-                                :          MEMORANDUM OPINION
                                                        :              AND ORDER
THE FEDERAL RESERVE BANK OF NEW                         :
YORK,                                                   :
                                                        :
                                      Defendant.        :
                                                        :
------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

        Plaintiff Gerard Nguedi, proceeding *pro se*, alleges that Defendant, the Federal Reserve Bank

of New York (the "NY Fed") subjected him to a hostile work environment and terminated his

employment due to racial animus.  Employing unsupported and anti-Semitic speculation,[1] Plaintiff

claims that Defendant discriminated against him due to his race as part of their scheme to "own

freedom and enslave the American people with infinite debt."  Pl.'s Local Rule 56.1 Resp. (ECF No.

102) ("56.1") ¶ 26.  The alleged scheme involved, *inter alia*, multiple job opportunities meant to

entice Plaintiff, an assassin in the guise of a deliveryman sent to Plaintiff's home, the personal

involvement of former New York City Police Commissioner William Bratton, and a workplace

environment in which undercover police officers constantly surrounded Plaintiff and Plaintiff was

poorly treated due to his race.  According to Plaintiff, Defendant utilized the undisputed fact that

that on December 23, 2015, Plaintiff entered the NY Fed with an illegal weapon in his luggage as a

pretextual excuse to mask Defendant's discriminatory motives for terminating his employment.  On

that basis, Plaintiff brings claims for violations of Title VII, the New York State Human Rights Law

("NYSHRL"), and the New York City Human Rights Law ("NYHCRL") due to his allegedly

discriminatory termination and the allegedly hostile work environment fostered by Defendant.

Before the Court is Defendant's motion for summary judgment as to all of Plaintiff's remaining claims.  As articulated below, Plaintiff has failed to adduce any evidence in support of his claims beyond his conclusory allegations and speculations, and, in any event, Plaintiff's decision to bring an illegal weapon onto the premises constitutes a legitimate, non-pretextual reason for Plaintiff's termination.  Accordingly, Defendant's motion for summary judgment is GRANTED and this case is dismissed.

## I.    BACKGROUND[2]

### A.  Facts

"Plaintiff is an African-American man from Cameroon" who, prior to his termination, worked as a Project Manager in the Electronic Payments Project Management Office of the NY Fed.  P56.1 ¶ 15; *Nguedi v. Fed. Reserve Bank of New York*, No. 16-cv-0636-GHW, 2017 WL 2557263, at *3 (S.D.N.Y. June 12, 2017) ("*Nguedi I*").  Plaintiff was not hired directly by the NY Fed, rather Defendant contracted for his services on an hourly basis through Source of Future Technology Inc. ("SOFT"), a third-party staffing agency.  56.1 ¶ 6.  Plaintiff was paid on an hourly basis for work performed—and was not compensated for "vacation/holidays."  Letter from SOFT to Pl., (ECF 98-4) (the "Job Offer").  Defendant and SOFT describe employees working at the NY Fed in "long term contract role[s]," email correspondence, May 29, 2015 (ECF No. 98-6) ("Job Description"), but who are not employees of the NY Fed, as being "[c]ontingent [w]orker[s]."  Pl.'s Work Order (ECF No. 93-3) (the "Work Order") at 2.  Contingent workers, such as Plaintiff, do not have a direct contractual relationship with Defendant.  56.1 ¶¶ 9-10.  Rather, when Defendant contracts for the services of contingent workers with SOFT, it does so through the vehicle of work orders, which are made pursuant to the March 23, 2015 Master Staffing Agreement between Defendant and SOFT (the "Master Staffing Agreement").  *Id; see, generally,* Master Staffing Agreement (ECF. No. 93-4).  Under the terms of the Master Staffing Agreement, unless superseded by language in a particular

work order, Defendant has the right to terminate any work order, and the corresponding contingent worker's work assignment, "upon notice to [SOFT] given at any time, for any reason, or for no reason." Master Staffing Agreement ¶¶ 1.4 (terms of Master Staffing Agreement incorporated by reference into subsequent work orders); 1.5 (conflicting terms in work orders given precedence over terms in Master Staffing Agreement); 10.2 (termination provision).

### 1. Events Prior to August 5, 2015

In May 2015, Donna Crouch, a Vice President of the NY Fed, contacted Frankois Alburquerque of the Contingent Workforce Office in the NY Fed's Human Recourses Group and requested his assistance in retaining the services of a contingent worker for a six-month assignment. 56.1 ¶¶ 2-3; Decl. of Frankois Alburquerque, May 31, 2018 (ECF No. 93) ("FA Decl.") ¶¶ 13-14; Decl. of Donna Crouch, May 31, 2018 (ECF No. 95) ("DC Decl.") ¶¶ 5-7. Including Plaintiff, eleven candidates for the job were considered. 56.1 ¶ 6. After interviewing Plaintiff telephonically and in person, and discussing his candidacy with other NY Fed Employees who also interviewed Plaintiff, Mrs. Crouch decided to retain Plaintiff's services. *See* 56.1 ¶¶ 6-7. Plaintiff was well qualified for the position, *id.* and requested that his hourly compensation be increased from the original offer off $90 per hour, to $95 per hour. *Id.* ¶ 6, 8. Defendant agreed, ultimately paying SOFT $125 per hour for Plaintiff's work; SOFT in turn compensated Plaintiff at the rate of $95 per hour. Work Order (ECF No. 93-3); Offer Letter (ECF No. 98-4). In order to retain Plaintiff's services, Defendant entered into the Work Order with SOFT dated August 28, 2015 which incorporated the terms of the Master Staffing Agreement. Work Order. The Work Order included an expected end date of December 29, 2015 for Plaintiff's work assignment. 56.1 ¶ 12; Work Order. Plaintiff's contract was with SOFT's sister organization, not Defendant. *See* Job Offer ("This position will be with our sister organization Softworks, through which SOFT's hourly employees work.").

### 2.  Plaintiff's Term of Employment:  August 5, 2015-December 23, 2015

On August 5, 2015 Plaintiff began providing services to the NY Fed as a Project Manager in the Electronic Payments Project Management Office.  56.1 ¶ 15.   Plaintiff and two other workers reported to Mrs. Crouch during the period of Plaintiff's employment.  56.1 ¶ 18.  Neither of those other two employees were Caucasian, and one, like Plaintiff, was also a contingent worker.  56.1 ¶¶ 16-17.  Early in Plaintiff's employment, Plaintiff participated in a training program which included information on the NY Fed's anti-discrimination and anti-harassment policies, and provided references to the NY Fed's Equal Employment Opportunity Office with contact information.  56.1 ¶ 19; *see* email from Pl., Aug 11, 2015 (ECF No. 96-2) (demonstrating Pl. took the "Ethics for Contingent Workers and Rules of Conduct Certification Course"); printout of Pl.'s "Ethics for Contingent Workers and Rules of Conduct Certification" (ECF No. 96-3) at 28-29.  During his work assignment, Plaintiff never filed a complaint with the EEO, nor is there any evidence that Plaintiff complained of discrimination during his employment.  56.1 ¶ 20; *see* Pl.'s Dep. (ECF. No. 96-1) at 98:4-99:24.[3]  All parties agree that Plaintiff's work was, at a minimum, satisfactory.  56.1 ¶ 21.  On September 16, 2015 Mrs. Crouch extended the duration of Plaintiff's work assignment to January 29, 2016.  56.1 ¶ 13; emails to Donna Crouch, Sept. 16-17, 2015 (ECF No. 95-1); FA Decl. ¶ 22.

### 3.  Plaintiff's Termination on December 23, 2015

On the morning of December 23, 2015, Plaintiff arrived at the NY Fed with luggage because he intended to travel to visit his sister that evening.  56.1 ¶¶ 26-27; Pl.'s Dep. at 47:10-17.  Inside his luggage was a taser and a cannister of pepper spray.  56.1 ¶ 26; Pl.'s Dep. 42-12-21 ("I had a Taser and a thumb-size pepper spray that I wanted to give my little sister, and that was in my luggages.")

The Federal Reserve Law Enforcement ("FRLE") is a police force, independent of the New York City Police Department ("NYPD"), which secures the NY Fed  56.1 ¶ 24.  The FRLE requires

that "all non-employee visitors (including contingent workers)" submit their bags to an x-ray scan at a security checkpoint before entering the premises.  56.1 ¶ 25.  Upon entering the building on December 23, 2015, and before his bag was scanned, Plaintiff voluntarily informed the FRLE that he had a taser and pepper spray in his luggage.  56.1 ¶ 26.

In the State of New York, it is illegal for a private citizen to possess a taser.  NY P.L. § 265.01 (Criminal Possession of a Weapon in the Fourth Degree); 56.1 ¶ 26 (citing *id.*). Accordingly, the FRLE officers on duty informed Plaintiff that the taser was illegal in the State, and confiscated both it and the pepper spray.  56.1 ¶ 27; Pl.'s Dep. 47:20-48:2 ("They say, well, in fact, its not permitted in New York State, so we will have to confiscate it.").  Then, the FRLE officers "summoned Delayne Hurley" the FRLE's "Director of Uniform Operations, who had never before interacted with either Mrs. Crouch or Plaintiff."  56.1 ¶ 28; decl. of Delayne Hurley, May 31, 2018 (ECF No. 92) ("DH Decl.") ¶ 10.  Pursuant to the FRLE's practice of contacting law enforcement when they believe a crime has been committed, the FRLE contacted the NYPD regarding Plaintiff's actions.  DH Decl. ¶ 7.  The NYPD subsequently arrived on the scene and arrested Plaintiff.  56.1 ¶ 30.

Mr. Hurley then contacted Mrs. Crouch, informed her of the events described above, and further informed her that he considered Plaintiff to be "risk to the New York Fed going forward." DH Decl. ¶¶ 14-15; 56.1 ¶ 32, DC Decl. ¶¶23-24.  Mr. Hurley's assessment of Plaintiff as a risk was based on three factors:  1) Plaintiff's possession of an illegal weapon; 2) his short term, indirect, and contingent relationship with the NY Fed; and 3) Plaintiff's demeanor in his interactions with Plaintiff on December 23, 2015.  56.1 ¶ 33 (citing DH Decl. ¶16).  Mr. Hurley then recommended that Plaintiff's work assignment be terminated.  *Id.* ¶ 34; DH Decl. ¶ 17; DC Decl. ¶ 24.  Mrs. Crouch, and her immediate superior Gail Aremndinger, discussed the issue, and "agreed to defer to Mr. Hurley's recommendation, given his knowledge and experience in in law enforcement."  56.1

¶ 36; DC. Decl. ¶ 26; decl. of Gail Aremndinger, May 31, 2018 (ECF No. 94) ("GA Decl.") ¶¶ 9-10.

After Mrs. Crouch communicated that information to Mr. Hurley, Mr. Hurley "called Mr.

Albuquerque and requested that he commence the off boarding process for Plaintiff."  *Id.* ¶ 37; DH

Decl. ¶ 18; FA Decl. ¶¶ 24-25.  As a result, the NY Fed's Contingent Workforce Force Office

terminated the Work Order with SOFT, with the ultimate effect of terminating Plaintiff's work at

the NY Fed  *Id.*; FA Decl. ¶ 26.

The criminal charge against Plaintiff was dismissed on February 22, 2016.[4]  Pl.'s Opp., Ex.

H (ECF No. 98-8).

## B.  Plaintiff's Unsupported Factual Allegations[5]

Plaintiff has alleged numerous additional facts, which are without support in the record

beyond his own statements.  The most colorful of those allegations include that Defendant is

affiliated with the Knights of the Klu Klux Clan, Pl.'s Opp. at 10; that "Defendant is a criminal

organization that targeted Plaintiff for assassination," *id.* at 3, potentially because Plaintiff believes

himself to be "the second coming of Jesus Christ," Pl.'s Dep. at 48:7-14; that Defendant continues

to target Defendant and is "using police services to harass Plaintiff in every areas [sic] of Plaintiff's

life, in different states/country," Decl. of Gerard Nguedi, July 3, 2018 (ECF No. 99) ("Pl.'s Decl.")

at 1, a scheme which included "multiple job opportunities" meant to entice Plaintiff into

Defendant's web, Pl.'s Opp. at 7; and that, as part of Defendant's scheme against him, Police

Commissioner William Bratton himself effected Plaintiff's December 23, 2015 arrest, Pl.'s Dep. at

141:4-143:19; Pl.'s Decl. at 14-15,—though Plaintiff contends that the "video surveillance footages

[sic] . . . were all edited to remove Mr. Bratton's intervention."  56.1 ¶ 28.  Those allegations are

totally lack evidentiary support beyond Plaintiff's conclusory allegations and speculations.

The Court does not attempt to discuss each of Plaintiff's myriad unsupported factual

allegations.  Suffice to say those allegations do not provide support for Plaintiff's claims of

discrimination here.  The following allegations, however, bear on the Court's analysis below, and are accordingly discussed in greater depth.

### 1.   Allegations Regarding Plaintiff's Employment Status

Plaintiff claims that he was told by Mrs. Crouch and others that his contract would "turn permanent," and that he would not have accepted the position at the NY Fed if he had understood it to be a contingent contract.  Pl.'s Opp. at 6.  The only relevant evidence Plaintiff cites for this proposition is a job description which described his position as a "long term contract role."  Job Offer.  At most, that language is ambiguous.  Plaintiff claims he understood it to mean a long-term role, meaning a year or more—with the potential to become permanent employment.  56.1 ¶¶ 4-6.  However, a more natural reading is that it is a contract role—as compared to a full-time role—which is comparatively long term.  Regardless, Plaintiff's understanding or misunderstanding of the nature of his employment does not change the undisputed fact that he was employed by SOFT, not Defendant, and was classified as a contingent worker.  Work Order; *see* Master Staffing Agreement.  There is evidence that Plaintiff was confused by the nature of his role, email from Pl., Dec. 2, 2015 (ECF No. 98-21) ("I was a little confused because I thought these were longer term contracts.  I probably didn't pay attention."), but there is no evidence that his role was anything other than as a contingent worker.

### 2.   Allegations Regarding Plaintiff's Work Identification Badge

Plaintiff alleges that Mrs. Crouch laughed at the photograph on his identification badge, a photograph which Plaintiff found to be embarrassing, and further alleges that Mrs. Crouch would not assist him in getting a new picture taken.  *See* 56.1 ¶ 46.  Mrs. Crouch denies this event took place.  DC Decl. ¶ 31.  Despite mentioning in his deposition that other employees, such as one Bob Gallo, witnessed portions of that interaction, Plaintiff has adduced no evidence beyond his conclusory allegations and speculations to support his version of events.  Pl.'s Dep. at 67:18-23.

And even assuming, *arguendo,* that these events did occur, Plaintiff has adduced no evidence that Mrs. Crouch's alleged refusal to assist him was due to racial animus.  *See id.* 68:6-71:4 (Q: Other than your statements, are you aware of any evidence supporting these allegations? . . . A. Any evidence like video?  You have all the videos.  You edit them and hide the crucial stuff in it. Remember?  All the evidences, you have.  Bring out that woman.  Talk to her.  That's the evidence.") *compare id. with* DC Decl. ¶ 31 ("These events did not occur.  Mr. Nguedi never asked me to help him get his photograph retaken.  In my 33 years at the New York Fed, no one reporting to me has ever asked for assistance in getting their identification badge photograph retaken.").  Even in Plaintiff's own account, Mrs. Crouch never made any facially discriminatory comments, nor could Plaintiff identify any other person whom Mrs. Crouch helped with a similar request, much less a relevant comparator.  *See* Pl.'s Dep. 69:9-71:4.

### 3.   Allegations Regarding Mrs. Crouch's Verbally Abusive Conduct

Plaintiff has alleged that "every day" he worked at the NY Fed, Mrs. Crouch yelled at him in front of "everyone."  Pl.'s Dep. 71:13-72:11.  Other than Plaintiff himself, no witness has provided testimony which supports Plaintiff's allegations, and Mrs. Crouch denies they took place.  DC Decl. ¶ 30.  In one such contested event, Plaintiff alleges the Mrs. Crouch told him to "show less leadership" in staff meetings.  56.1 ¶ 45.  Mrs. Crouch, again, denies this event took place.  DC Decl. ¶ 29.

Plaintiff has testified that he understood that alleged comment to mean that "as a black person, you don't . . . speak[] in a room full of white people with leadership."  Pl. Dep. 76:7-77:8. However, even in Plaintiff's own account, Mrs. Crouch did not say anything beyond asking him to show less leadership—Plaintiff claims to have "understood what she want[ed]," Pl.'s Dep. 76:4-12, but he does not even allege Mrs. Crouch ever made any reference to race or national origin in any of

her alleged comments, nor has he provided any evidence of context from which the Court could imply a discriminatory animus behind Mrs. Crouch's alleged statement. *Id.;* 56.1 ¶ 45.

### 4. Allegations Regarding Mr. Hurley's Racial Animus

As a general matter, Plaintiff has accused essentially every actor in this fact pattern of racism, without any evidence beyond his own conclusory allegations and speculations. As his indirect allegations against Mr. Hurley bear on the analysis below, the Court takes up the issue here.

Plaintiff has alleged that he was "classified as a risk only because [he] is a black man." 56.1 ¶ 35. As he was classified as a risk by Mr. Hurley, the Court interprets that statement as an allegation that Mr. Hurley classified Plaintiff as a risk due to racial animus on Mr. Hurley's part. There is no evidence supporting that assertion.

The uncontroverted evidence shows that Mr. Hurley classified Plaintiff as a risk due to 1) his possession of an illegal weapon; 2) Plaintiff's short term, indirect, and contingent relationship with the NY Fed; and 3) Plaintiff's demeanor in his interactions with Plaintiff on December 23, 2015. 56.1 ¶ 33 (citing DH Decl. ¶16). The uncontroverted evidence also shows that, prior to their interaction on December 23, 2015, Plaintiff and Mr. Hurley had never met or had any interaction with each other. 56.1 ¶ 28; DH Decl. ¶ 10.

### C. Procedural History

Plaintiff filed this case on January 27, 2016. Since that time, he has amended his complaint five times. The Fourth Amended complaint was the subject of a motion to dismiss, which the Court granted in full on June 11, 2017. *Nguedi I*, 2017 WL 2557263, at *8 (dismissing Pl.'s false arrest claim with prejudice). The Fifth Amended Complaint was the subject of another motion to dismiss, which was granted in part on December 1, 2017. *Nguedi v. Fed. Reserve Bank of New York*, 16--0636-GHW, 2017 WL 5991757, at *12 (S.D.N.Y. Dec. 1, 2017) ("*Nguedi II*"). In its December 1, 2017 opinion, the Court dismissed with prejudice Plaintiff's "Title VII hostile work environment claim,

NYCHRL claim premised on the cafeteria worker's and ID clerk's conduct, and claims against the NYPD and Mr. Bratton." *Id.* at *12.   "Plaintiff's Title VII discrimination claim, NYSHRL discrimination claim, and NYCHRL claim, to the extent the NYCHRL claim is based on [Mrs.] Crouch's conduct, survive[d]." *id.*

On June 1, 2018, Defendant moved for summary judgment on all remaining claims.  Notice of Mot. (ECF No. 89).  *Pro se* Plaintiff was provided with notice of his obligations in opposing that motion on the same date.  Notice to *Pro Se* Litigant who Opposes a Mot. For Summary Judgment (ECF No. 97).  That motion was fully briefed by July 20, 2018, and is now before the Court.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

In employment discrimination cases, where direct evidence of intentional discrimination is rare, "affidavits and depositions must be carefully scrutinized for circumstantial proof" of discrimination. *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 275 (S.D.N.Y. 2011) (citing *Gallo v. Prudential Residential Servs., Ltd. Pshp.*, 22 F.3d 1219, 1224 (2d Cir. 1994)), *aff'd*, 470 F. App'x 20 (2d Cir. 2012). "However, even in such cases, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment and show more than some metaphysical doubt as to material facts." *Id.* at 275-76 (internal quotations omitted) (citing *Schwapp v. Town of*

*Avon*, 118 F. 3d 106 (2d Cir. 1997); *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010));

*Brown v. Johnson & Johnson Consumer Products, Inc.*, 92-cv-7886-KTD, 1994 WL 361444, at *3 n.3

(S.D.N.Y. July 11, 1994) ("To assert that [defendant's] witnesses may be lying, without any evidence

to contradict the witnesses' testimony cannot defeat a motion for summary judgment.") (citation

omitted).

   Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must

construe that party's submissions "liberally and interpret them to raise the strongest arguments that

they suggest." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 536 (2d Cir. 1999) (internal quotation

marks and citations omitted).  Proceeding *pro se*, however, "does not . . . relieve [the opposing party]

from the usual requirements of summary judgment." *Fitzpatrick v. New York Cornell Hosp.*, No. 00-

cv-8594, 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003).

## III.   DISCUSSION

### A.   Title VII

   Title VII makes it an "unlawful employment practice for an employer to fail or refuse to hire

or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.  Plaintiff has alleged that he was

classified as a risk and then terminated due to his race, in violation of Title VII.

   "The ultimate issue in any employment discrimination case is whether the plaintiff has met

his burden of proving that the adverse employment decision was motivated at least in part by an

impermissible reason—i.e., that there was discriminatory intent." *Sharpe v. MCI Commc'ns Servs., Inc.*,

684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quotation marks deleted).  A plaintiff may prove a

discrimination claim either through direct evidence of intent to discriminate or by indirectly showing

circumstances giving rise to an inference of discrimination. *Vega v. Hempstead Union Free Sch. Dist.*,

801 F.3d 72, 87 (2d Cir. 2015).  Where, as here, a Plaintiff alleging discrimination under Title VII does not present direct evidence of discriminatory intent, a summary judgment motion is subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (applying *McDonnell Douglas* framework to Title VII summary judgment motion).  Under that framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by demonstrating that:  (1) he belonged to a protected class; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination.  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251-52 (2d Cir. 2014).  "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  "When considering whether a plaintiff has raised an inference of discrimination by showing that she was subjected to disparate treatment, [the Second Circuit has] said that the plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."  *Id.* (quotation marks omitted).  "What constitutes 'all material respects' therefore varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Id.* at 40.

"Establishment of a *prima facie* case 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  *Adeniji v. Admin. for Children Servs., NYC*, 43 F. Supp. 2d 407, 419 (S.D.N.Y. 1999) (quoting *Fisher v. Vassar College*, 114 F. 3d 1332, 1335 (2d Cir. 1997), *aff'd sub nom. Adeniji v. Admin. For Children's Servs.*, F.3d 430 (2d Cir. 1999); *Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  If the plaintiff meets that initial burden, the burden shifts to

13

the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *Abrams*, 764 F.3d at 251. If the employer offers such a reason, the presumption of discrimination raised by the *prima facie* case is rebutted, and the burden returns to the plaintiff to point to evidence from which a reasonable jury could conclude that the employer's stated reasons are merely a pretext for unlawful discrimination. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).

### 1. Plaintiff's Title VII Claim of Discriminatory Termination

Even assuming, *arguendo* that Defendant, rather than SOFT, was Plaintiff's employer for the purposes of Title VII, Plaintiff has not adduced evidence sufficient to establish a *prima facia* case of discriminatory termination. There is no question that Plaintiff is a member of a protected class, was qualified for his position, and suffered an adverse employment action when he was terminated. *Abrams*, 764 F.3d at 251-52. However, Plaintiff has failed to adduce evidence sufficient to demonstrate that his termination "took place under circumstances giving rise to an inference of discrimination."

Plaintiff has failed to identify a comparator who is "similarly situated" to himself, and was treated better, which is fatal to this potential basis to establish his *prima facia* case. *Graham*, 230 F.3d at 39; *Pierre v. New York State Dep't of Corr. Servs.*, 5-cv-0275-RJS, 2009 WL 1583475, at *12 (S.D.N.Y. June 1, 2009) ("A court can properly grant summary judgment [on a discrimination claim] where no reasonable jury could find the similarly situated prong met.") (quoting *Spiegler v. Israel Disc. Bank of N.Y.*, 1-cv-6364-WK, 2003 WL 21983018, at *2 (S.D.N.Y. Aug. 19, 2003). Assuming, *arguendo*, that the standards governing discipline of employees who bring illegal weapons into the NY Fed are the same for all contingent workers, in order to demonstrate a *prima facie* case, Plaintiff would need to demonstrate that another contingent worker, who was outside Plaintiff's protected class, brought an illegal weapon into the NY Fed or engaged in similarly serious misconduct, and suffered lesser

consequences than Plaintiff.

Mr. Hurley, the Director of Uniform Operations for the NY Fed, has declared that is unaware of any other NY Fed personnel, contingent worker or otherwise, who brought an illegal weapon into the bank. DH Decl. ¶ 21; 56.1 ¶31.  Indeed, the only evidence of anyone other than Plaintiff bringing an illegal weapon into the NY Fed is of two *job applicants* who brought weapons into the NY Fed.  Supplemental Declaration of Delayne Hurley, July 19, 2018 (ECF No. 104) ("DH Sup. Decl.") ¶¶ 2-3.  One of those men, Mr. Elliot A. Ray, is the only person Plaintiff has identified as a potential comparator.  *See* Pl.'s Opp. (ECF No. 98) at 5-6.  According to Plaintiff, Mr. Ray, "as a white man received better treatment from Defendant despite the fact that he was carrying a loaded gun" when he entered the NY Fed.  *Id.*

Even assuming *arguendo* that Mr. Ray is Caucasian, despite the lack of evidentiary support for that proposition, Mr. Ray was a job applicant, not an employee.  DH Sup. Decl. ¶¶ 2-3, 10.  He is therefore not an adequate comparator to Plaintiff.  *See Graham* 230 F.3d at 39 ("A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated *employee* outside his protected group.") (emphasis added). While the circumstances of the comparator need not be identical, the comparator must, at minimum, also be an employee.  *Id.*  Accordingly, Mr. Ray is not a valid comparator, and Plaintiff has failed to identify any other "similarly situated" comparator, which is fatal to his Title VII claim because there is no basis for a reasonable jury to infer that Plaintiff's termination had anything to do with his race.  *Pierre*, 2009 WL 1583475, at *12 (S.D.N.Y. June 1, 2009).

Furthermore, even if Mr. Ray were a comparator, and assuming *arguendo* that Mr. Ray is Caucasian, Mr. Ray was not treated better by the NY Fed than Plaintiff was.  On December 18, 2012 Mr. Ray entered the NY Fed carrying a firearm and ammunition.  DH Sup. Decl. ¶ 5.  He was detained by the FRLE, and subsequently released to the United States Federal Protective Services

("FPS").  DH Sup. Decl. ¶¶ 7-9.  Similarly, when Plaintiff entered the NY Fed with an illegal

weapon, he was detained by FRLE, and subsequently released to the NYPD.  The only difference in

the NY Fed's treatment of the two men is which law enforcement body the NY Fed contacted in

each case.  Mr. Ray claimed he legally possessed his firearm as part of his employment with the FPS.

DH Sup. Decl. ¶ 7.  Therefore, the FRLE released Mr. Ray to the FPS as the law enforcement body

best situated to determine if Mr. Ray had committed a crime.  DH Supp. Decl. ¶ 9.  Similarly,

Plaintiff was released to the NYPD, the law enforcement entity best situated to determine if Plaintiff

had committed a crime.  So even if Mr. Ray were a valid comparator, his treatment by the NY Fed

was not more favorable than Plaintiff's.[6]  Any actions taken by the NYPD are not relevant to this

inquiry.  The inquiry is as to the treatment of Plaintiff, and the potential comparator, by the NY Fed.

Beyond Plaintiff's failure to identify a similarly situated employee, Plaintiff has otherwise

failed to produce any evidence upon which a reasonable jury could conclude that his termination

was discriminatory.  The uncontroverted evidence indicates that Mr. Hurley's recommendation

initiated Plaintiff's offboarding and eventual termination.[7]  56.1 ¶ 34; DH Decl. ¶ 17; DC Decl. ¶ 24.

Plaintiff claims that Mr. Hurley identified him as a risk going forward and recommended his

termination "simply because [he] is a Black man."  Pl.'s Decl. at 13.  However, other than Plaintiff's

allegations, the record is bereft of any evidence supporting an inference that Mr. Hurley acted due to

a discriminatory animus.  On the other hand, the uncontroverted evidence shows that Mr. Hurley

identified Plaintiff as a risk going forward on the basis of three factors:  1) the fact that Plaintiff

entered the NY Fed with an illegal weapons; 2) Plaintiff's demeanor during Mr. Hurley's subsequent

interaction with Plaintiff and 3) his status as a contingent worker without a long term relationship to

the NY Fed.  56.1 ¶ 33; DH Decl. ¶ 16.  "[A]ssert[ing] that [the witness] may be lying, without any

evidence to contradict [his] testimony cannot defeat a motion for summary judgment."  *Brown v.*

*Johnson & Johnson Consumer Products, Inc.*, 92-cv-7886-KTD, 1994 WL 361444, at *3 n.3 (S.D.N.Y. July

11, 1994). This is especially the case here, as Plaintiff had never met Mr. Hurley before the events leading to his termination, and, even in his own account, has no basis for his accusation of racial animus other than Mr. Hurley's decision to classify him as a threat and recommend his termination.

Accordingly, upon review of the record, the Court finds that no reasonable jury could conclude that Plaintiff has demonstrated a *prima facie* case of discriminatory termination, and grants summary judgment to Defendant as to Plaintiff's remaining Title VII claims.[8]

### B. New York State Human Rights Law[9]

Discrimination claims pursuant to the NYSHRL are subject to the same standard as Title VII claims. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *Salazar v. Ferrara Bros. Bldg. Materials Corp.*, No. 13-cv-3038-JG, 2015 WL 1535698, at *5 (E.D.N.Y. Apr. 6, 2015). Therefore, summary judgment is granted to Defendant as to Plaintiff's NYSHRL claim for the reasons described in Section III(A), above.

### C. New York City Human Rights Law[10]

Section 8-107(1)(a) of the NYCHRL makes it "an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the . . . race, . . . color[, or] national origin . . . of any person, . . . to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). A plaintiff may bring claims under the NYCHRL for both discrimination and hostile work environment. *See Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 658 (E.D.N.Y. 2015). "Because claims for hostile work environment and discrimination are governed by the same provision of the NYCHRL, they are analyzed under the same standard." *Bacchus v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 214, 246 (E.D.N.Y. 2015).

Unlike Title VII, the NYCHRL "does not require 'a connection between the discriminatory conduct and a materially adverse employment action.'" *Garrigan v. Ruby Tuesday, Inc.*, No. 14-cv-155,

2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114 (2d Cir. 2013)).  Indeed, the NYHRL is a "one-way ratchet, by which interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall."  *Mihalik*, 715 F.3d at 109 (quotation marks omitted).   The proper inquiry under the NYCHRL is whether the plaintiff "was treated 'less well' because of her [membership in a protected class]."  *Pena-Barrero v. City of New York*, No. 14-cv-9550, 2017 WL 1194477, at *15 (S.D.N.Y. Mar. 30, 2017) (quoting *Mihalik*, 715 F.3d at 111) (alterations in original).

The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Mihalik*, 715 F.3d at 109 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (Ct. App. 2011)).  "The Court considers the totality of the circumstances, and while courts may dismiss truly insubstantial cases, even a single comment may be actionable in the proper context."  *Bacchus*, 137 F. Supp. 3d at 245.  Nonetheless, the NYCHRL "is not a 'general civility code.'"  *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S. 2d 27, 40-41 (App. Div. 1st Dep't 2009)).  "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss.  [He] must show that [he] has been treated less well at least in part 'because of [his protected characteristic].'"  *Id.* (citing *Williams*, 872 N.Y.S. 2d at 39, 40 n.27).

"To defeat summary judgment on a discrimination or hostile work environment claim, the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason."  *Bacchus*, 137 F. Supp. 3d at 246 (quotation marks and quotation omitted).  "The employer may then present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination but is only entitled to summary judgment where the record establishes as a matter of law that discrimination played no role in its actions."  *Id.* (alterations, quotations, and quotation marks omitted).

In its December 1, 2017 decision, the Court held that Plaintiff had plausibly alleged "that [Mrs.] Crouch treated him 'less well' than other similarly situated employees outside of his protected classes." *Nguedi II*, 2017 WL 5991757, at *11.  As Mrs. Crouch was Plaintiff's supervisor, and the NY Fed is vicariously liable for any actions taken by Mrs. Crouch which may have violated the NYCHL, Plaintiff's hostile work environment claim survived to the extent it related to Mrs. Crouch. *Id.* at *12.  However, to the extent that Plaintiff's hostile work environment claim related to actions or comments by "the cafeteria employee and the ID clerk," those claims were dismissed.  *Id.*

Accordingly, Plaintiff's remaining NYCHRL claims are 1) his claim for discriminatory termination and 2) his claim as to a hostile work environment created by Mrs. Crouch.  For the reasons that follow, no reasonable jury could find for Plaintiff on either claim, and accordingly summary judgment is granted to Defendant as to Plaintiff's NYCHRL claims..

### 1.  Plaintiff's NYCHRL Discriminatory Termination Claim

As discussed above in § III(A), Plaintiff has adduced no evidence other than his allegations and speculations that his termination was "caused by a discriminatory motive."  *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S. 2d 27, 40-41 (App. Div. 1st Dep't 2009)). Nor is there any basis in the record upon which the Court could conclude that Plaintiff's termination was "because" of, or had anything to do with, his race.  *Pena-Barrero*, 2017 WL 1194477, at *15.  Nor is there any evidence that Plaintiff's termination meant he was treated at all "less well" than anyone else would have been in his circumstance.  Accordingly, even under the liberally construed NYCHRL, Plaintiff has failed to adduce even that minimal quantum of evidence necessary to preclude summary judgment in favor of Defendant.

Moreover, Defendant had "legitimate, non-discriminatory motives" for terminating Plaintiff, and there is no evidence, outside Plaintiff's conclusory allegations and speculations, that discrimination played any role in his termination.  *Bacchus,* 137 F. Supp. 3d at 246.  It is an

uncontested fact that Defendant brought an illegal weapon into the NY Fed.  56.1 ¶ 26; Pl.'s Dep.
42-12-21; *see* NY P.L. § 265.01.  That is a legitimate, non-discriminatory motive for Plaintiff's
termination.  If Plaintiff had advanced any evidence beyond his own conclusory allegations and
speculations which tended to show that discrimination played any role in his termination, his
NYHCRL claim might have survived summary judgment.  *Bacchus*, 137 F. Supp. 3d at 246 ("The
employer may then present evidence of its legitimate, non-discriminatory motives to show the
conduct was not caused by discrimination but is only entitled to summary judgment where the
record establishes as a matter of law that discrimination played no role in its actions.") (quotation
marks and alterations omitted).  Here, however, Plaintiff has adduced no such evidence.
Accordingly, summary judgment is granted to Defendant as to Plaintiff's claim for discriminatory
termination under the NYCHRL.

### 2.  Plaintiff's NYCHRL Hostile Work Environment Claim

Plaintiff has also completely failed to adduce any evidence, outside his own conclusory
allegations and speculations, which tends to show that he was subjected to discriminatory treatment
while employed at the NY Fed.  Accordingly, summary judgment is granted to Defendant as to
Plaintiff's surviving hostile work environment claims under the NYCHRL.

Broadly speaking, Plaintiff has advanced four possible grounds for his hostile work
environment claim.  First, he alleges that Mrs. Crouch yelled at him "every day" of his work
assignment in front of "everyone."  56.1 ¶ 43, Pl.'s Dep. 71:13-72:11.  Second, he alleges that Mrs.
Crouch once told him to "show less leadership."  56.1 ¶ 45; Depo 74:13-16.  Third, he alleges that
Mrs. Crouch laughed at an identification badge photograph he found embarrassing and refused to
help him get the picture retaken and replaced.  56.1 ¶¶ 46-47; Pl.'s Dep. 67:13-17.  And fourth,
Plaintiff alleges that "since day one" of his employment, his work area was consistently monitored
by three police officers under the guise of co-employees.  56.1 ¶ 48; Pl.'s Dep. 94:4-195:18.  Beyond

his own conclusory allegations and speculations, Plaintiff has submitted no evidence to support his claims that these events took place, or that even if those events did take place, they had any nexus to his membership in a protected class.

Taking Plaintiff's allegations in reverse order:  Plaintiff admits that his belief that the "coworkers" stationed near him were in reality undercover police officers is based purely on his speculation.  *See* Depo 95:22-97:14.[11]  On the other hand, both Mrs. Crouch and Mr. Hurley have submitted declarations categorically denying that Plaintiff's claim has any basis in fact.  56.1¶ 49; DC Decl. ¶ 28; DH Decl. ¶¶ 26-27.  Plaintiff "may not rely on conclusory allegations or unsubstantiated speculation," to survive summary judgment.  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).  Given the lack of evidence supporting his claim, and the evidence to the contrary, the Court concludes that no reasonable jury could determine that the NY Fed used undercover officers to surround Plaintiff in his workspace.  Accordingly, the Court need not further consider this aspect of Plaintiff's claim.

As to the remaining three allegations, they all suffer from the same fatal flaw—the total lack of evidence connecting these purported events with a discriminatory animus.  Even assuming, *arguendo*, that Mrs. Crouch yelled at Plaintiff every day, told him to show less leadership, and laughed at him while refusing to help him get his identification photograph replaced—as described those are all facially neutral acts untethered to discriminatory intent.[12]

The NYCHRL "is not a 'general civility code.'"  *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S. 2d 27, 40-41 (App. Div. 1st Dep't 2009)).  "The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive.  It is not enough that a plaintiff has an overbearing or obnoxious boss.  [He] must show that [he] has been treated less well at least in part 'because of [his protected characteristic].'"  *Id.*  Plaintiff has made it clear that he believes these events took place, and that he believes he was targeted "simply because [he is] a Black

man and solely based on race" 56.1 ¶ 26.  However, he failed to produce evidence of the context of these alleged events, statements from other employees who witnessed the alleged events, or any other evidence beyond his own speculations from which the Court could infer a discriminatory animus motivating these actions (even assuming, *arguendo*, that they took place).  Nor has Plaintiff even claimed that Mrs. Crouch or any other NY Fed employee ever made a facially discriminatory statement.  In sum, there is no evidence upon which a reasonable jury could conclude that Plaintiff was treated less well, and even assuming *arguendo* that he was treated less well, there is no evidence upon which a reasonable jury could conclude that that any ill treatment he endured "was because of" his membership in a protected class." *Mihalik*, 715 F.3d at 110.  Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's hostile work environment claim.

## II.   CONCLUSION

For the reasons state above, Defendants motion for summary judgment is GRANTED in its entirety.

The Clerk of Court is directed to enter judgment for Defendant, and to terminate this case. The Clerk of Court is further directed to mail this opinion and order to Plaintiff, by certified mail, at both the address listed on the docket, and the address referenced in the Court's July 26, 2018 order. (ECF No. 107).

SO ORDERED.

Dated:  March 7, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[1] *E.g.* Plaintiff's allegation that Defendant "is a "MONSTROUS JEWISH ORGANISATION."  56.1 ¶ 26.

[2] The facts presented in this opinion are, in large part, taken from the parties Local Rule 56.1 statements, as well as the declarations of various witnesses, and Plaintiff's deposition.  In his 56.1 response, blanketly denies many of the facts presented here, often failing to cite any evidence in support of his denial.  *E.g.* 56.1 at ¶ 35 ("Other than Plaintiff, no one who reported to Mrs. Crouch has ever possessed a weapon of any kind on New York Fed premises or has been deemed

a risk by Federal Reserve Law Enforcement.  DC Decl. ¶ 25.  PLAINTIFF RESPONSE: <u>NOT TRUE</u>.  Plaintiff was not there during the 33 plus years Mrs. Crouch has been working for Defendant to attest of such a statement and Plaintiff was deemed a risk by Defendant only because Plaintiff is a Black man.  Additionally, Plaintiff saw many people with all sorts of weapons inside the Defendant [sic] facilities and has no ways [sic] of tracking how all these weapons got in there, every day of the week 24 hours a day but yet Plaintiff's little key-chain pepper spray some how makes Plaintiff a 'Risk.'  Triggering the same question again, there are plenty of weapons and guns at the Federal Reserve, so Defendant cannot argue nobody ever for in there with a key chain knife or key chain tool similar to what Plaintiff had in his luggage.  Who else is Defendant classifying as a 'risk' and a risk of what exactly?  What tangible risk Defendant saw [sic] in Plaintiff?  Plaintiff is classified as a risk only because Plaintiff is a black man.  What other bogus classifications like that [does] Defendant applies [sic] on black people?  How many?  And what are they doing to these people?  And who is determining if what they do to the people they classify as [sic] 'risk' or anything else they can come up with, is consistent with the United States Constitution?  Defendant believe it has life and death rights on citizens as they can use the police to execute innocent citizen simply because of their race, as plaintiff [sic] experienced first hand.  Plaintiff [sic] mere possession of these [sic]safety equipment is not a crime and Plaintiff should have never been arrested as Plaintiff had no intention to use these [sic] equipment against Defendant.")

In the instances where Plaintiff did cite to evidence, the evidence cited most often either did not support his position or was simply inapposite.  *E.g.* 56.1 ¶ 20 ("During his work assignment, Plaintiff never raised any discrimination concerns though [the NY Fed's applicable] procedure.  Pl. Dep. 88:19-17.  PLAINTIFF RESPONSE: <u>NOT TRUE</u>.  Plaintiff raised discrimination and other issues and was never helped.  Appendix G"; *compare id. with* App'x G to Pl.'s Opp. (ECF No. 100-7) (email from Plaintiff reporting an alleged incident in which a delivery man appeared at Plaintiff's home without Plaintiff having ordered anything, and without any reference to discrimination—or even race in general); *see also* Pl.'s Dep. (ECF No. 96-1) at 91:18-20 ("That's how I know the Federal Reserve was trying to kill me.  Because that guy was not a delivery guy.").

As was done in this case, "if the moving party seeks summary judgment against a *pro se* litigant, the moving party is also required to notify the *pro se* litigant of the requirements of Rule 56 and Local Civil Rule 56.1."  *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009); *see* Notice to *Pro Se* Litigant Who opposes a Motion for Summary Judgment (ECF No. 97).  "Pro se litigants are not then excused from meeting the requirements of Local Rule 56.1.  *Id.* (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.*, 373 F.3d 241, 246 (2d Cir.2004).  However, "where a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Id.* (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir.2001); *Johnson v. New York*, 4-cv-1070-DLI-LB, 2007 WL 764514, at *6, 2007 U.S. Dist. LEXIS 17212, at *18–19 (E.D.N.Y. Mar. 9, 2007).  In light of Plaintiff's *pro se* status the Court has independently reviewed the complete record in its attempts to substantiate Plaintiff's assertions—and has, in the vast majority of instances, been unable to find any evidence supporting those assertions.

---

[3] Pl.'s Dep. at 99:4-15("Q. The conduct that you're claiming is discriminatory.  Did you tell anyone here that 'I'm being discriminated against'?  A. Yeah.  Q. Who did you tell?  A. I'm not going to tell you.  Q. Why not?  A. Because I don't want to.  I told a few people.  Q. You're going to withhold that information.  A. I will until I need it to come out.); *id.* at 99:11-18 (Q. But did you tell them verbally?  A. I told everyone.  Let me answer that question.  I told everyone in the universe that the Federal Reserve is a crappy place filled with racists, racist white Jews, racist white people that are out there to destroy everybody else and enslave everybody who is not interested in paying attention in what they're doing.").

[4] The fact that the criminal case against Plaintiff was ultimately dismissed on February 22, 2016 could not have been known to any party when the decision to terminate Plaintiff was made on December 23, 2015, and could not have impacted the decision making of any NY Fed employee, or any NYPD officer on December 23, 2015, despite Plaintiff's protestations that he was eventually "completely exonerated" of that crime.  56.1 ¶ 29.

[5] Beyond Plaintiff's conclusory allegations and speculations, he offers almost no evidence to support his claims—which is insufficient at the summary judgment stage.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts") (citations omitted); she *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (non-movant may not "may not rely on conclusory allegations or unsubstantiated speculation") (internal quotation marks and citation omitted).

[6] Of course, as a job applicant, Mr. Ray could not have been, and was not, terminated—demonstrating why he cannot be considered a valid comparator.  And even if the analogy between Plaintiff and Mr. Ray were stretched beyond its

breaking point, there is no evidence that Mr. Ray was hired by the NY Fed after his firearm related incident.

7 The vast majority of Plaintiff's allegations relate to Mrs. Crouch's alleged discriminatory animus.  Plaintiff has not produced evidence sufficient to support those claims, but even if he had, there is no evidence that Mrs. Crouch had anything to do with Plaintiff's termination beyond Plaintiff's claim that "Mrs. Crouch and her supervisors are lying" about their lack of involvement in his termination.  56.1 Resp. ¶ 35.

8 Even if, *arguendo*, Plaintiff had demonstrated his *prima facie* case of discriminatory termination, the Court would still have granted summary judgment to Defendant due to Defendant's legitimate, non-pretextual basis for terminating Plaintiff.  Simply put, it is undisputed that Plaintiff, a contingent worker working pursuant to an at will contract, brought an illegal weapon into the NY Fed.  That is a legitimate, nondiscriminatory ground for termination.  Beyond Plaintiff's speculations and conclusory allegations, he has adduced no evidence that his illegal conduct was a mere pretext justifying his termination.  On the other hand, four NY Fed employees have testified, and contemporaneous documentation confirms, that Plaintiff's termination was, in fact, due to his decision to bring an illegal weapon into the NY Fed.  *See, generally*, DH Decl.; DC Decl.; GA Decl.; FA Decl.  In sum, Defendant has a compelling, non-discriminatory, and legitimate basis for Plaintiff's termination, and Plaintiff has advanced no evidence supporting his allegations that those reasons were mere pretext masking discriminatory animus.  On the record presented, no reasonable jury could conclude that Plaintiff's termination was discriminatory.

9 Defendant asserts that both the NYSHRL and the NYSHRL, as applied to Defendant in Plaintiff's claims, are preempted by federal law.  Def.'s Br. (ECF No. 90) at 21.  The Court need not, and does not, reach that issue, as Defendant has been granted summary judgment on all claims.

10 *See* n.8, above.

11 "Q: How do you know that these individuals were police officers?  A. Because they looked, smelled, walked, talked, and did everything like police officer except having a badge, because I'm pretty sure they have guns. I saw some of them with guns. So people with guns don't work in technology in general.  Q. Did you inform anyone else at the New York Fed that these people around you had guns?  A. What? It's not my business."

12 To be clear, beyond Plaintiff's own statements, there is no evidence supporting his claim that these events took place.  Nor is there evidence supporting Plaintiff allegation that Mrs. Crouch sent an assassin to his apartment under guise of a delivery man.  Pl.'s Dep. 92:7 ("Everyone was suspecting [Mrs. Crouch] sent a killer to my house.").